# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **LAWRENCE AZEVEDO,** | ) | 1:09-CV-375  AWI DLB |
| | ) | |
| **Plaintiff**, | ) | **ORDER ON CROSS MOTIONS** |
| **v.** | ) | **FOR SUMMARY JUDGMENT** |
| | ) | |
| **CITY OF FRESNO, CITY OF FRESNO** | ) | (Doc. Nos. 26, 32) |
| **POLICE DEPARTMENT, OFFICER** | ) | |
| **KARR, and DOES 1 through 10,** | ) | |
| **inclusive,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

This case arises from the detention and arrest of Plaintiff Lawrence Azevedo by Fresno police officer Defendant Nathan Carr ("Carr") while Azevedo was staying at a residence on Weldon Avenue.  Azevedo has brought suit under 42 U.S.C. § 1983 against Carr and the City of Fresno ("the City").  After dismissal of claims based on the Fourteenth Amendment, Azevedo alleges violations of his Fourth Amendment rights to be free from unreasonable searches and seizures, including excessive force.  Azevedo also alleges *Monell* liability against the City.  Both parties move for summary judgment on the issue of Carr's seizure of Azevedo, including Carr's entry into the Weldon residence's front yard.  Additionally, Defendants move for summary judgment on Azevedo's *Monell* liability claims, while Azevedo moves for sanctions based on the City's alleged spoliation of evidence.  For the reasons that follow, the Court will grant summary judgment in favor of Defendants on Azevedo's seizure entry and seizure claims, grant and deny summary judgment on various *Monell* issues, and grant Azevedo a permissive inference jury instruction based on spoliation of evidence by the City.

# FACTUAL BACKGROUND[1]

At approximately 2:00 a.m. on November 7, 2007, Carr was in a marked police car with his partner, Officer Juan Avila ("Avila").  See DUMF 12; PUMF 1.  Both Carr and Avila were in uniform and identifiable as police officers.  DUMF 35.  The officers observed an illegally parked motorcycle in front of 2105 E. Weldon Avenue (hereinafter, "the Property").  See DUMF 12; PUMF 1.  Carr declares he recognized the motorcycle from a prior contact on October 26, 2007.  See PUMF 2; DUMF 12.  He also recognized the helmet as looking the same as the one on the rider in the prior contact.  DUMF 12.

Carr informed Avila that he had observed the same motorcycle approximately 12 days earlier in the vicinity, when he pulled behind it, ran the plates and noted the tags were expired by more than one year.  DUMF 13.  Specifically, on October 26, 2007, while assigned to uniformed patrol duties and driving a marked police vehicle, Carr pulled behind a motorcycle and ran the plates.  DUMF 10.  The tags were expired in excess of one year.  Id.  Carr intended to make a traffic stop due to the expired tags.  Id.  The motorcycle quickly stopped, pulling up on the sidewalk before Carr initiated the stop.  Id.  Carr was in uniform and immediately exited his vehicle and waved the rider over.  Id.  The rider looked at Carr and then sped off driving recklessly, jumping the curb, speeding, and failing to stop for stop signs.  Id.  Fresno Police Department Event Report 07BO520 details the October 26, 2007, event and lists the registered owner of the motorcycle as Alexander Renteria.  DUMF 11.[2]  However, Azevedo was not the

---

[1]"DUMF" refers to Defendants' undisputed material fact;  "PUMF" refers to Plaintiff's undisputed material facts;  "PAUMF" refers to Plaintiff's additional undisputed material facts.  Additionally, the parties make many objections to various pieces of evidence/proposed facts.  To the extent that the Court utilizes such evidence/proposed facts, any objections thereto are deemed overruled.

[2]Citing page 45, lines 10 to 21 of his deposition testimony, Azevedo contends that this incident never occurred.  Those lines, plus testimony into page 46, read:

Q:  Prior to your arrest . . . on November 7, 2007, do you remember an incident where you were riding the motorcycle, and an officer followed you, and you pulled over and the officer pulled over and got out of his vehicle and then you drove away from the scene?

**A:  No.**

Q:  That never happened?

**A:  Not with me.  Not with me.**

Q:  Who else would have been riding that motorcycle besides you?

**A:  Nobody.  So it wasn't my motorcycle.**

Mr. Fattahi:   I'm going to interpose an objection.  Vague as to time.

driver of the motorcycle on October 26, 2007.  See Footnote 2, *supra*.

Looking at the motorcycle and the helmet, Carr recalled that the registration was expired by over a year, and that the driver had evaded his original attempt to initiate a traffic stop. DUMF 14.  The license plate of the motorcycle involved in the prior incident matched that of the one parked in front of the Property.  DUMF 15.  Officer Carr confirmed again that the registration had expired.  DUMF 17.  He examined the motorcycle and could not locate a VIN number.  Id.;[3]  see also PUMF 4.  A tow truck was dispatched to impound the motorcycle since the tags were expired and the VIN could not be located.  DUMF 17; see also PUMF 3. Regulations allowed Carr to impound the motorcycle without contacting the owner.  PUMF 38.

---

Q:   Well, in October of 2007, who else would have been riding that motorcycle besides you?
A:   **Well - -**
     . . . . .
A:   **I don't even remember that date for number one.  But it wasn't – it wasn't – I know I wasn't driving – I didn't have no altercations with the cops because I always stayed – because I knew the tags were bad, I always, like, didn't cause attention.  I've never been – I've never had no cops behind me or any of that, because I wouldn't drive fast, or I wouldn't do nothing against the law because I knew my tags were bad.  So I mean –**
Q:   So you knew you were driving with expired tags?
A:   **Yes, ma'am.  I'm not saying the chase or any kind of officer trying to pull a bike over.  I'm just saying it wasn't mine, so - -**

Azevedo Depo. 45:10-46:19.  Additionally, on the night of November 7, 2007, Azevedo was in possession of a Suzuki motorcycle which he received from Alex Renteria.  DUMF 16.  Azevedo testified that he could not remember how long he had been riding the motorcycle prior to November 7, 2007.  See Azevedo Depo. 38:1-14.  Azevedo could not say if he had been riding the motorcycle for a day, a week, or a month.  See id. at 38:12-21.

The Court is not persuaded that a genuine dispute exists.  Once Azevedo was questioned about a particular time frame (October 2007), Azevedo stated that he did not remember that "date"/time frame.  Azevedo then stated that the driver was not him.  He later appears to state that he is not disputing that an officer attempted to pull a bike over, it just was not his.  Additionally, Azevedo does not address the authenticity of the police report dated October 26, 2007.  Further, Azevedo has not shown that Carr did not tell Avila that Carr recognized the bike from a previous encounter.  Finally, Azevedo could provide no time frame in which he had been riding Renteria's motorcycle.  In other words, Azevedo may well started driving the bike after October 26, 2007.  In light of the October 26, 2007, police report, Avila's testimony of Carr's conversation with him, Azevedo's lack of recollection regarding October 2007, and Azevedo's inability to provide any time frame whatsoever in which he had been riding Renteria's motorcycle (other than November 7, 2007), the evidence indicates that on October 26, 2007, Carr saw a bike with the same plates as the one in front of the Property, but the driver of that motorcycle was not Azevedo.  Azevedo's testimony, especially his inability to establish any time frame in which he had been riding the motorcycle, is not sufficient to create a *genuine* disputed issue of material fact regarding the October 26, 2007, encounter.

[3]Azevedo disputes this fact by stating that the motorcycle's VIN was noted on the FPD Vehicle Inventory Report form, dated November 7, 2007.  See Fattahi Opp. Dec. Exh. D.  However, Defendants rightly point out that there is no indication of how the VIN was found or determined.  That another officer, having unknown experience and knowledge and using unknown methods, was later able to locate a VIN does not change the fact that Carr was unable to do so.  Without evidence that the VIN was easily detectable or sufficiently legible or otherwise "in plain sight," that another officer located the VIN does not sufficiently contradict that Carr was unable to do so.

1    Carr looked up prior attachments for the Property on the patrol car's computer before

2    exiting the car.  See PUMF 5.  Carr reviewed an entry from October 9, 2007.  PUMF 6.  In the

3    upper third portion of the entry it is noted that "resd is vacant."  Fattahi Dec. Exh. H.  In the

4    officer's notes at the bottom of the entry, it was noted that:  the Property was rented to a tenant

5    named "Anita Bernal," it "appears that the resident has not been home," it "appears that the

6    resident may be out of town or gone."  See PUMF 7; Fattahi Dec. Exh. H.  When asked about

7    this entry, Carr testified that "that the owner of the house was reporting the residence was vacant

8    and it appeared the homeowner had moved out."  Carr Depo. 32:2-4.  Avila testified that he

9    recalled the entry as indicating that the Property was "possibly vacant."  Avila Depo. 11:15-18.

10    The Property was surrounded by a waist high spiked, wrought iron fence.  See PUMF 20;

11    DUMF 26.  The fence looks sturdy, but the iron bars appear to be thin and there are significant

12    spaces/gaps between the bars; as such, the fence does not prevent people from seeing the

13    Property and the front yard.  See Carr Dec. Exh. D.  The iron fence is a modest distance from the

14    house.  PUMF 21.  The iron fence has two gates, one in front and one on the west side of the

15    house ("west-gate").  See Carr Depo. 38:7-19.  Both gates had locking mechanisms.  See PUMF

16    24.  The front gate is directly across from the house's front door, and there is a cement pathway

17    that leads from the front gate to the front door.  See Carr Dec. Exh. D.  The west-gate opened to

18    the backyard and led to the street and to a detached garage.  See Carr Depo. 38:9-39:2; Avila

19    Depo. 18:16-19:3.  The owner of the Property, Jose Coria ("Coria"), had the iron fence installed

20    for the safety of his family after a man tried to break in.  See PUMF 23.  Further, there was a

21    wooden fence, which had a wooden gate, that separated the front yard from the backyard.  See

22    Carr Depo. 38:23-39:10; PUMF 32.  The gate of the wood fence that separated the front yard

23    from the back yard had a reflective sign on it that warned, "BEWARE OF DOG."  PUMF 33.

24    The mailbox was outside of the front fence.  PUMF 22.

25    On November 7, 2007, the wood gate separating the front yard from the back yard was

26    open, but the west-gate to the street was closed.  PUMF 32.[4]  There was "a lot" of dog waste

27

28    [4]DUMF 21 indicates that the west-gate was open, while PUMF 32 indicates that the west-gate was shut.
     The dispute is immaterial for this order.  For ease, the Court will view the west-gate as being closed.

everywhere outside the house, including the front yard.  PUMF 31.  The front iron gate was

completely closed that night.  PUMF 42.  Azevedo always kept the gate locked by wrapping a

tire chain around it so it could not be pried up.[5]  PUMF 43.  Carr and Avila testified that a metal

chain, similar to a "bike chain," was wrapped or draped around the front gate to prevent the gate

from swinging open.  See Avila Depo. 21:21-22:14; Carr Depo. 45:17-47:15.  Carr testified that

the front gate's lock mechanism did not work.  See Carr Depo. 46:22-47:2.

    As Carr and Avila continued their investigation, they observed that the Property had

overgrown vegetation[6] and appeared to be vacant.  DUMF 21.[7]  The house's front metal security

screen door was wide open.  Id.  Although the wood front door appeared closed, PUMF 34, the

officers also noticed that the front door appeared significantly damaged with a hole where the

doorknob and lock set should have been.  DUMF 21.  There were newspaper and cloth/curtains

covering some of the front windows.  Id.; PUMF 35.  Several other windows had no coverings.

See Carr Depo. 35:21-22; Carr Dec. Exh. D.  A low light could be seen through the paper and

around the corners of the windows.[8]  DUMF 21.  At this point the officers were concerned that

there was a possible burglary or unlawful trespass, in addition to the original

concerns about the motorcycle, i.e. the motorcycle may have been stolen.  See DUMF 24;

---

[5]Azevedo kept the front gate secured with a chain for his safety, to keep his dog from getting loose, and to keep Coria out.  See Coria Depo. 28:10-14; Azevedo Depo. 53:7-19, 54:23-55:1.  Azevedo also submits that, every time Coria came to the Property, the front gate was always locked.  See PUMF 25.  However, Defendants rightly objects that the deposition testimony does not describe how the gate was locked, how often Coria would go to the Property, or even when Coria last went to the Property.  The Court will not consider PUMF 25.

[6]At his deposition, Carr testified that the "grass was overgrown, it was growing up along the edge fo the house."  Carr Depo. 48:2-7.  Azevedo contends that the grass on the lawn was normal, and relies on the picture of the house and on Coria's testimony that he did not have to pull weeds or large amounts of grass from the yard.  However, the photograph of the lawn grass is generally inconclusive, but grass does appear to be growing up the edge of the house.  As for Coria's testimony, he does not say when he trimmed the yard, and he testified that he did not recall how the grass appeared on November 7.  In light of the color photograph of the Property, the Court will view the term "overgrown" as meaning grass was growing along/up the side of the house.

[7]Azevedo disputes portions of DUMF 21 through citation to recorded statements by Avila and Carr made during an internal affairs investigation.  The Court does not believe that a genuine dispute exists.  The gist of Azevedo's argument is that some of the assertions made by Carr and Avila in this motion were not made during the interviews.  The Court does not see contradicting, "sham" testimony by the officers that would cause it to disregard the deposition testimony.  See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991).

[8]It was later determined that the light emanated from the fireplace.  See Carr Depo. 43:7-10; PUMF 36.

1   PUMF's 39, 41, 70.  Based on the previous incident with the motorcycle, the expired registration

2   and the apparent lack of a VIN number, as well as the possibility of a burglary or squatting or

3   unlawful trespass, the officers decided to make contact at the location, to attempt to find the

4   owner of the motorcycle, and to investigate the security of the residence.  See DUMF 23.[9]

5       Carr and Avila decided to enter the property and then approach the front door.  See

6   PUMF 40.  Carr never considered getting a warrant and did not attempt to contact Coria before

7   entering.[10]  PUMF's 44, 48.  Carr removed the chain from the iron fence gate, and the officers

8   went through the gate towards the front door.  See PUMF's 50, 52.  Removing the chain and

9   opening the front gate was the only way to get into the front yard aside from attempting to hop

10  the spiked fence.  PUMF 51.[11]  After entering the gate and upon approaching the front door, the

11  officers noticed locking mechanism pieces, which appeared consistent with both the wood front

12  door and metal screen door, laying on the porch and in the flower bed.  DUMF 28.[12]  Carr also

13  noticed a glove next to the broken lock which is consistent with someone unlawfully entering a

14  house.  DUMF 29.[13]  Neither Carr nor Avila announced their presence verbally before they

15  reached the front door.  PUMF 53.

16      At the porch, Carr looked through a hole in the wood front door into the living room.  See

17  PUMF 54.  Avila was standing on the grass in front of the house, one foot east of the path

18  leading to the porch stairs and front door.  PUMF 59.  In an attempt to investigate and make

19  contact with whomever was in the residence, Carr knocked on the wood front door.  See DUMF

20

21      [9]DUMF 23 is undisputed because the arguments Azevedo uses to dispute it have already been discussed and
    rejected.

22

23      [10]After the incident, officers called Coria using the cell phone number that was listed on the prior
    attachment at the residence on October 9.  PUMF 49.

24      [11]Defendants dispute this fact by arguing that "a side gate," which the Court takes to mean the west-gate,
    provided access.  However, Carr and Avila both indicated that the west-gate led to the backyard, not the frontyard.

25  See Carr Depo. 38:20-25; Avila Depo. 18:21-19:3.  PUMF 51 is undisputed.

26      [12]Azevedo disputes this DUMF by arguing that it was dark outside and Carr claimed not to have noticed
    dog feces in the yard.  Neither contention actually disputes DUMF 28.

27

28      [13]Azevedo disputes the DUMF in part by arguing that "Carr was asked what he saw before approaching the
    residence and he did not mention seeing a glove."  However, the DUMF indicates that Carr saw the glove after he
    entered the front yard, not before.  DUMF 29 is undisputed.

30.[14]  The wood front door immediately swung open since it was not secured, and Carr for the first time announced, "Fresno Police."  See DUMF 30; PUMF's 55, 56; Carr Depo. 43:20-24.

Once the door opened, a large dog immediately began to growl and bark, and advanced on Avila in an aggressive and threatening manner.  DUMF 31.  See Carr drew his gun and backed up.  PUMF 57.  Avila back-peddled away from the dog.  See PUMF 60.  While Carr was yelling at the dog, Azevedo came outside the threshold of the front door, and Carr told him to get his dog.  PUMF 61; see also DUMF 31.  Azevedo called his dog, and it stopped in its tracks and turned, then Azevedo heard a gunshot.  PUMF 62.[15]  Avila fired a shot at the dog in response to the dog's aggression.  See DUMF 31.  The bullet impacted the step just below the porch in front of the threshold of the front door, and the dog was not injured.  See DUMF 31; PUMF 64.  Avila shot at Azevedo's dog while the dog was on the grass near the porch steps, and Azevedo was on the porch by the threshold of the front door.  See PUMF 63; Carr Depo. 61:8-17.  Azevedo then walked down and grabbed his dog.  PUMF 65; DUMF 32.  Carr told Azevedo to put the dog in the house and close the door.  PUMF 66.  Azevedo picked up the dog and took it inside the house.  PUMF 67; DUMF 32.  However, the door was still not secured.  DUMF 32.[16]

Because of their concerns about Azevedo's dog and their safety, the officers asked Azevedo to step outside the gate and ordered him to sit on the curb.  See DUMF 33;[17] PUMF 68; Azevedo Depo. 81:22-25.  Carr told Plaintiff twice to sit down on the sidewalk in front of the gate.  PUMF 69.  Requesting that Azevedo take a seat on the curb was consistent with taught and

---

[14]Azevedo disputes DUMF 30 by arguing that Carr and Avila intended to "detain and/or arrest" him. Azevedo cites PUMF's 68 through 71.  These PUMF's involve Carr telling Azevedo to walk outside the gate and sit on the curb (PUMF's 68, 69), the offenses that Carr was investigating (PUMF 70), and that Carr and Avila believed that they had detained Azevedo (PUMF 71).  However, these facts do not take into account the encounter with dog after the door opened, do not address the officers' intent, and three of the facts (68, 69, and 71) do not address the "pre-knock" time frame.  DUMF 30 is undisputed.

[15]There is a dispute whether the dog had stopped at the time that the shot was fired.  For purposes of this motion, it does not matter whether the dog had stopped when Avila fired, as no damages are sought for the gunshot.

[16]Azevedo disputes this fact by stating the dog remained in the house until animal control arrived. However, that the dog remained in the house does not change the fact that the door was not secured, especially since the door appeared to be missing its handle and lock.

[17]Azevedo takes issue with the word "asked."  However, since the officers do not dispute that they had detained/seized Azevedo, whether the officers "asked" or "ordered" is of no consequence.

1   trained police practices, as a matter of Azevedo's safety and the safety of the officers.  See

2   DUMF 34.  The officers believed that they had detained Azevedo and that he was not free to go

3   about his business.  See PUMF 71.  Azevedo was being detained while the officers investigated a

4   possible burglary, trespass, squatting, and stolen motorcycle.  See DUMF 37; PUMF 70.

5        Azevedo did not sit at the curb very long before he attempted to flee by running down the

6   street.  See DUMF 36; PUMF 72; PAUMF 66.  Carr told Azevedo to keep his hands visible.  See

7   DUMF 39.[18]  Avila inquired whether Azevedo had any weapons in his possession, and Azevedo

8   jumped up and ran.  Id.  Azevedo did not recall being asked questions by the officers.

9   See Azevedo Depo. 90:13-91:2.

10       While fleeing from the officers, Carr deployed his department issued taser on Azevedo,

11  after which Azevedo was taken into custody.  DUMF 41.  It appears Azevedo was tasered while

12  he was on cement or concrete.  See Azevedo Depo. 95:1-4.  Azevedo suffered multiple facial

13  fractures and injuries, which required surgery the insertion of metal plates into his face.[19]  See

14  PAUMF's 76, 115, 116, 117.  Carr testified that he deployed the Taser while running after

15  Azevedo at full speed.  See PAUMF 69.  Carr had been gaining on Azevedo.  See Ramirez Depo.

16  at 27-28.  Azevedo was neither assaultive nor combative, and Carr never saw anything that

17  looked like a weapon in Azevedo's possession before deploying the taser.  See PAUMF's 70, 71.

18       Both officers believed that they had probable cause to arrest Azevedo for violation of

19  Penal Code § 148.  DUMF 41.  Part of the reason Azevedo ran from the officers was because he

20  was in possession of methamphetamine.  See DUMF 40.  Azevedo had probably taken

21  methamphetamine within 24 hours of his arrest.  See DUMF 43; Azevedo Depo. 60:2-7.  After

22  placing Azevedo under arrest, Carr found drugs and drug paraphernalia.  PAUMF 77; DUMF 44.

23  Although Azevedo was arrested for violations of Penal Code § 148(a)(1), Health and Safety

24

25       [18]There is a genuine dispute whether Azevedo was reaching into his waistband – Carr declares yes, but
    Azevedo testified no.  Also, Azevedo disputes whether Carr told him to keep his hands visible and whether Avila
26  asked if he had weapons.  However, the testimony cited by Azevedo simply states that Azevedo did not recall being
    asked questions.  Of particular note, when asked whether he remembered the officers asking  about weapons,
27  Azevedo replied, "No.  I don't recall it, but I ran right away too."  Azevedo Depo. 90:23-91:2.  In these
    circumstances, Azevedo's lack of recollection does not adequately dispute whether Avila asked about weapons.

28       [19]There is a dispute as to whether additional force was used against Azevedo.  However, Azevedo's
    excessive force claims are not at issue in this motion.

1  Code § 11377(a), and Business and Professions Code § 4140, see DUMF 45, no criminal charges

2  were ever filed against Azevedo arising out of this event.  See PAUMF 78.

3        On the night of November 7, Azevedo had been asleep in the front bedroom of the house

4  with his dog.  See PUMF 15; DUMF 1.  Although he could not recall for how long, see DUMF 1,

5  Azevedo had been staying at the Property for more than one day before November 7.  See PUMF

6  14.  Coria (the owner) rented the Property to Anita Abraham.  See PUMF 12.  Azevedo testified

7  that Abraham asked him to stay at the Property and watch her belongings while she was

8  incarcerated in the Fresno County Jail.  See Azevedo Depo. 49:4-14; PUMF 13; DUMF 2.  Coria

9  had begun eviction proceedings against Abraham, but he did not know whether the eviction

10  process had been completed as of November 7, 2007.  See Coria Depo. 25:5-26:1.  Azevedo

11  testified that he would not leave the Property until either Abraham "got out of jail" or Coria "did

12  it the legal way of evicting."  Azevedo Depo. 54:6-8.  Azevedo did not pay rent, did not receive

13  mail at the Property, and Coria had told Azevedo to leave.  See DUMF's 3, 4, 5.  At the time of

14  the incident, Azevedo's "more permanent" residence was a motor home that was parked in front

15  of his friend's house.  See DUMF 7; Azevedo Opp. Dec. ¶ 3.  With the possible exception of

16  some socks and a shirt, Azevedo's clothes were at his motor home and not at the Property.  See

17  DUMF 8; Azevedo Opp. Dec. ¶ 2.  Aside from a motorcycle helmet, some socks, and a shirt,

18  Azevedo cannot identify any items that belonged to him that were at the Property on the night of

19  the incident.  See DUMF 9; Azevedo Opp. Dec. ¶ 2.

20

21                          **SUMMARY JUDGMENT STANDARD**

22        Summary judgment is appropriate when it is demonstrated that there exists no genuine

23  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

24  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

25  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

26  judgment bears the initial burden of informing the court of the basis for its motion and of

27  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

28  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

1  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

2  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

3  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

4  Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

5  sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

6  477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

7          Where the moving party will have the burden of proof on an issue at trial, the movant

8  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

9  movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

10  proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

11  element of the non-moving party's claim or by merely pointing out that there is an absence of

12  evidence to support an essential element of the non-moving party's claim.  See James River Ins.

13  Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

14  & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

15  to carry its burden of production, then "the non-moving party has no obligation to produce

16  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

17  Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the

18  moving party meets its initial burden, the burden then shifts to the opposing party to establish

19  that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v.

20  Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The

21  opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

22  instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

23  trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting

24  Fed. R. Civ. Pro. 56(e)).

25          The evidence of the opposing party is to be believed, and all reasonable inferences that

26  may be drawn from the facts placed before the court must be drawn in favor of the opposing

27  party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad.

28  Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

## I.  DETENTION OF AZEVEDO

### A.  Azevedo's Standing

*Plaintiff's Argument*

Azevedo argues that he has standing to challenge the entry into the Property's curtilage. Azevedo was an overnight guest of the Property's renter, Abraham.  That Coria was the landlord/renter does not matter, nor does it matter that Anita may have been behind in her rent. As an overnight guest of Abraham, Azevedo had a reasonable expectation of privacy in the Property, and thus has standing.

*Defendants' Argument*

Defendants argue that Azevedo had no legitimate expectation of privacy.  Although

Azevedo claims he was an overnight guest, he does not know how long he was there, did not pay rent, did not receive mail, lived in a motorhome, and had his clothes in the motorhome. Azevedo has no verification that he was authorized to stay at the house. His bald assertion that he was an overnight guest is insufficient to establish a legitimate expectation of privacy.

*Legal Standard*

A person who claims that a search violated the Fourth Amendment bears the burden of proving that the search was illegal and that the person had a legitimate expectation of privacy in the thing searched. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); United States v. $40,955.00 in U.S. Currency, 554 F.3d 752, 756 (9th Cir. 2009). The expectation of privacy must be actually/subjectively held and must be "one that society is prepared to recognize as reasonable." Smith v. Maryland, 442 U.S. 735, 740 (1979); $40,955.00, 554 F.3d at 756. A person's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." Minnesota v. Olson, 495 U.S. 91, 96-97 (1990); see Espinosa v. City & County of San Francisco, 598 F.3d 528, 533 (9th Cir. 2010); United States v. Gamez-Orduno, 235 F.3d 453, 458 (9th Cir. 2000). However, a person's bald assertion, without more, that he is an overnight guest is insufficient to establish his actual status an overnight guest. See United States v. Reyes-Bosque, 596 F.3d 1017, 1026 (9th Cir. 2010); United States v. Armenta, 69 F.3d 304, 308 (9th Cir. 1995).

*Discussion*

The evidence presented is insufficient for the Court to decide as a matter of law whether Azevedo has standing to challenge the officers' entry into the Property's yard. Azevedo claims that he was the overnight guest of Abraham, who rented the Property. A person may be the guest of a lessee/renter and have a legitimate expectation of privacy as the lessee's/renter's guest. See Espinosa, 598 F.3d at 533; United States v. Washington, 573 F.3d 279, 284 (6th Cir. 2009). Azevedo had some socks, a shirt, a motorcycle helmet, and his dog at the house. Azevedo was also able to exclude the owner of the Property, Coria, from entering the yard and the Property.

See Azevedo Depo. 53:7-19; PUMF 29.[20]  Coria's testimony and Azevedo's testimony indicate that Azevedo had stayed in the house longer than a single night.  Further, Azevedo was able to identify the person who gave him permission to stay at the house, the circumstances behind the permission, and the reason for his presence at the house.  All of these facts tend to show that Azevedo had Abraham's permission to be an overnight guest in the house.  However, the real force of Azevedo's arguments are based on his own testimony about Abraham's request or invitation.  The Ninth Circuit has warned that bald assertions of permission do not establish one's status as an overnight guest.  Defendants rely heavily on *Armenta*.  However, this case is not quite like *Armenta*, because Azevedo, unlike the *Armenta*, was able to identify the person who gave consent for him to be an overnight guest (and there is no dispute that Anita was the leased/rented the Property),[21] explained the circumstances behind that consent, and also successfully excluded the owner of the property.  Nevertheless, conspicuously absent from this case is any evidence from Abraham, who is asserted to be a friend of Azevedo's.  Also absent is evidence of items that one would expect to find in the possession of an overnight guest, i.e. full change of clothes, toothbrush, etc.

Azevedo's argument on this point is close to amounting to little more than his own "bald assertion" of guest status.  See Armenta, 69 F.3d at 308.  Nevertheless, the Court believes that the evidence could support a finding that Azevedo was an overnight guest.  Because a trier of fact could reasonably reach opposite conclusions regarding Azevedo's status, the Court denies summary judgment to both parties on the issue of Azevedo's standing.

B.      Curtilage

*Plaintiff's Argument*

Azevedo argues that the fenced front area of the Property was protected curtilage pursuant to the factors set forth in United States v. Dunn, 480 U.S. 294, 302 (1987), and as applied in the

---

[20]PUMF 29 is undisputed and reads:  "In past encounters, Coria would knock on the front gate and Plaintiff would come out of the house."

[21]Coria's testimony indicates that he had begun eviction proceedings, but did not know when or if those proceedings had completed.  The Sixth Circuit has held that overdue rent, without an actual eviction, does not eliminate a renter's, or a renter's guest, reasonable expectation of privacy in the rented property.  See Washington, 573 F.3d at 284-85.

case of <u>Madruga v. County of Riverside</u>, 431 F.Supp.2d 1049 (C.D. Cal. 2005).  The front of the Property was completely enclosed by the highest fence that the local City ordinance allows, and the mailbox was on the outside of the fence.  There was a "beware of dog" sign on the wood gate.  The front of the iron fence was a modest distance from the house.  The two gates of the iron fence were closed and "locked."  The locking of the gate effectively extended the walls of the house.  Therefore, the front of the Property was protected curtilage.

### *Defendants' Argument*

Defendants argue that the front yard is not protected curtilage.  The yard and porch are clearly visible to any passer-by.  The iron fence is meant to be more decorative than to provide any privacy, and is only waist high.  There are no signs stating "no trespassing," and the "beware of dog" sign is not on the iron fence, but instead is on the wood gate that separate the front and back yards.  Finally, the manner in which the iron gate was secured is probative.  A chain was looped around the fence.  There was no locking mechanism on the chain, and the chain simply had to be lifted up.  There was no reasonable expectation of privacy in the front yard.

### *Legal Standard*

The Fourth Amendment protects both a home and the home's curtilage.  <u>See</u> <u>United States v. Dunn</u>, 480 U.S. 294, 300 (1987); <u>Oliver v. United States</u>, 466 U.S. 170, 180 (1984); <u>United States v. Warner</u>, 843 F.2d 401, 405 (9th Cir. 1988).  Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life."  <u>Oliver</u>, 466 U.S. at 180; <u>United States v. Barajas-Avalos</u>, 377 F.3d 1040, 1057 (9th Cir. 2004).  The Supreme Court has explained that curtilage questions are to be resolved with particular reference to four factors:  (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by.  <u>Dunn</u>, 480 U.S. at 301; <u>United States v. Davis</u>, 530 F.3d 1069, 1077-78 (9th Cir. 2008); <u>United States v. Soliz</u>, 129 F.3d 499, 502 (9th Cir. 1997).  The "primary focus" and "central component of this inquiry is whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life."  <u>Dunn</u>, 480 U.S.

at 300, 301 n.4; <u>United States v. Furrow</u>, 229 F.3d 805, 817 (9th Cir. 2000); <u>United States v. Traynor</u>, 990 F.2d 1153, 1158 (9th Cir. 1993). "Every curtilage determination is distinctive and stands or falls on its own unique set of facts." <u>United States v. Depew</u>, 8 F.3d 1424, 1426 (9th Cir. 1993).[22]

### *Discussion*

The first *Dunn* factor is proximity of the disputed area to the home. The Court will view the disputed area as the front yard. "Proximity is not determinative as there is no fixed distance at which curtilage begins or ends." <u>Soliz</u>, 197 F.3d at 502. The parties have not given the Court any measurements of the land parcel, the front yard, or the distance of the home to the front of the fence. Nevertheless, photographs of the front of the Property reveal a typical urban lot that is not particularly large. Azevedo describes the distance from the house to the front of the fence as "modest." While hardly precise, describing the distance as "modest" is fair and indicates a distance that is close to the home. This factor weighs in favor of a finding of curtilage.

The third factor is the uses to which the front yard was put. No evidence has been presented about the uses of the front yard. The picture of the house and the front yard gives no hint as to any uses. The only function may be to simply separate the street from the front porch. There is an indication that Azevedo would let his dog roam the front yard at night in order for the dog to relieve itself.[23] The Court has reservations about whether Azevedo's use may be considered in determining whether the front yard is curtilage. Azevedo did not rent the Property, did not own the Property, and has attempted to characterize himself as an "overnight guest." In other words, Azevedo had no long term connection to the Property. As such, the relevant uses would appear to be those of Abraham, who actually rented and lived at 2105 E. Weldon, and

---

[22]*Depew*, *Traynor*, *Furrow*, and *Soliz*, cited above, were all overruled on the issue of the appellate standard of review for curtilage determinations in *United States v. Johnson*, 256 F.3d 895, 913 n.4 (9th Cir. 2001) (en banc).

[23]Azevedo identified no uses in his brief in support of summary judgment. <u>See</u> Court's Docket Doc. No. 32 at p. 11-12. The Court gleans this use from the undisputed fact regarding the dog waste in the front yard, the undisputed fact that the dog was inside the home at the time of the incident, from Azevedo's reply in which he states that the fence was used to extend the territory of his dog at night, and Azevedo's testimony that states the dog used the front yard for "a restroom." Azevedo's reply, however, cites no evidence in support of his express assertion (in fact, the assertion is about one line, <u>see</u> Court's Docket Doc. No. 56 at 4:9-10) and there is no evidence to indicate how long or how often the dog was allowed to roam the front yard.

under whose authority Azevedo claims to have standing.  Nevertheless, this issue has not been

briefed because the suggested use was not raised until Azevedo's reply brief.  Assuming without

deciding that the "overnight guest" Azevedo's use of the alleged curtilage has probative value,

this use does not even involve a "private" activity by Azevedo, or any human for that matter.  It

is hardly a use associated with the "privacies of life," especially given the frequency with which

people walk their dogs in public (be it parks or sidewalks) for this very purpose.  See Soliz, 197

F.3d at 502-03.  This factor weighs against a finding of curtilage.

    The second *Dunn* factor is whether the front yard is surrounded by an enclosure that

surrounds the home.  Although not conclusive, "[f]encing configurations are important factors in

defining the curtilage."  Dunn, 480 U.S. at 301 n.4; Davis, 530 F.3d at 1078.  Here, the front yard

and the home are surrounded by the wrought iron fence.  The presence of the iron fence is

indicative of curtilage.  However, courts have also observed that, generally "the enclosure factor

weighs against those who claim infringement of the curtilage when their land is divided into

separate parts by internal fencing."  Bleavins v. Bartels, 422 F.3d 445, 452 (7th Cir. 2005);

United States v. Reilly, 76 F.3d 1271, 1278 (2d Cir. 1996).  The Property has more than one

fence and there are separate demarcations on the property parcel.  Specifically, there is also a

wooden fence that separates the front and backyards.  That fence is a six foot tall "standard

fence," and it prevents people from "seeing over it."  See Carr Depo. 39:1-10.  It is significantly

different from the iron fence in both height and design.  Further, the "beware of dog" sign is on

the wooden fence, to the side of the house – it is not on the iron fence.[24]  That the sign is on the

wooden fence indicates that the dog in question is located behind the wooden fence, not inside

the iron fence in the front yard.  The wooden fence, as well as the "beware of dog" sign on that

fence, indicate a separateness between the front and back yards and the house.  This sense of

separateness is further reinforced by the absence of evidence regarding use of the front yard.  The

iron fence weighs in favor of curtilage, but the presence of the wood fence, which creates

additional demarcations by separating the front yard from the rest of the property, tempers this

consideration and weighs against curtilage.  See Bleavins, 422 F.3d at 452.

---

[24]There is no indication that other signs, such as "no trespassing" signs, were on either fence.

The final *Dunn* factor is the steps taken to protect the front yard from observation by passers by.  The Court cannot see that any steps were taken to prevent the front yard from observation.  As discussed above, there was a wrought iron fence.  However, pictures of the Property show that the iron fence does nothing to prevent the front yard from observation.  The iron bars are thin, the fence is not high (three and a half to four feet, perhaps), and there are significant gaps between each bar.  The iron fence was erected by Coria, not to prevent others from observing the front yard or the activities occurring therein, but to act as a deterrent to, or provide safety from, burglars and thieves.  See PUMF 23.  There is no evidence that the iron fence was meant to prevent observation from passers by.  In reply, Azevedo has indicated that City ordinances prevent fences from being more than 4' tall.  Be that as it may, the purpose of the fence was never to obscure observation.  Further, a fence is not the only method of preventing observation.  Physical boundaries, such as thick trees, shrubberies, or underbrush may effectively block visibility and prevent observation.  See United States v. Johnson, 256 F.3d 895, 903 (9th Cir. 2001).  However, there are no trees, bushes, or other natural barriers in the front yard that materially obscure observation.  There is simply no evidence that steps were taken to protect the front yard from observation.  This factor weighs against a finding of curtilage.

The primary focus in determining curtilage is whether the area "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life."  Dunn, 480 U.S. at 300, 301 n.4.  The Court sees no evidence of any intimate or private activity in the front yard that is associated with either the home or one's private life.  Application of the *Dunn* factors reveal that the front yard is essentially open to public view, no evidence of any use has been presented, and there are additional demarcations within the wrought iron fence.  The evidence simply indicates an enclosed piece of land that is close to the house.  Cf. Cowart v. Enrique, 311 Fed. Appx. 210, 213-214 (11th Cir. 2009) (applying *Dunn* factors to conclude that a front yard was not curtilage despite the fact that the front yard was enclosed by a fence).  When an area is open to view and there is no indication of it being used by the resident, it is unclear how that area can be said to harbor private or intimate activity.

Azevedo relies heavily on a case from the Central District of California, *Madruga*.  The

yard in *Madruga* had the following characteristics: it was immediately adjacent to the home, it was surrounded by a 5' 4" tall solid wall that shielded the home from public view, a "warning – guard dog" sign was posted on the wall very close to the entrance foot gate, there were two 5' tall wooden gates that were shut, and the yard "was used for activities intimately associated with those that take place inside the house itself such as barbecues, parties, or as an area of quiet contemplation." *Madruga*, 431 F.Supp.2d at 1056.  These characteristics are materially different from the Property's front yard.  The "beware of dog" sign in this case was not on the iron fence, rather it was on the wooden fence that separated the front and backyards.  The *Madruga* fence was solid, tall, and could certainly keep out prying eyes.  The iron fence in this case, however, was much shorter, not solid, and does nothing to prevent observation.  The yard in *Madruga* was used for barbecues, parties, and quiet contemplation.  No use has been adequately identified in this case, and the suggested use is neither private nor comparable to barbecues, parties, and quiet contemplation.  The Court readily agrees that the yard in *Madruga* was protected curtilage. However, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts."  *Depew*, 8 F.3d at 1426.  The facts in this case are distinguishable from *Madruga*, and those facts do not show that the front yard "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life."  *Dunn*, 480 U.S. at 300, 301 n.4.

The evidence and arguments do not show that the front yard is protected under the Fourth Amendment as curtilage.  Summary judgment in favor Defendants for the officers' entry into the front yard will be granted.

C.    Seizure of Azevedo

*Defendants' Argument*

Defendants argue that the officers had a reasonable suspicion that criminal activity was occurring.  The information about the motorcycle, the residence being reported as vacant, and their observations of the house indicated criminal activity.  Because the officers had reasonable suspicion, they lawfully detained Azevedo for questioning.

Once Azevedo was lawfully detained, he jumped up from the curb and ran from the officers.  Both police experts agree that, if a person who is lawfully detained runs from the

police, that person is in violation of Penal Code § 148(a)(1) for obstructing a police officer and thus, is subject to arrest.  Since that is what Azevedo did, there was probable cause to arrest him.

Alternatively, Carr requests qualified immunity because, under the totality of the circumstances, a reasonable officer could conclude that Carr's actions were lawful.

### Plaintiff's Response

Azevedo argues that the officer's entry into the yard was illegal.  The officers cannot rely on the "knock and talk" exception because they had the intent to detain Azevedo when they entered the curtilage.  Further, the "knock and talk" exception does not apply because measures had been taken to impede entry into the yard, and those measures would indicate to a reasonable person that entry was restricted.

In order to commit the crime of obstructing a police officer, there must be a lawful detention.  However, because the officers' entry into the yard was unlawful, the detention of Azevedo was also unlawful.  Because the detention was unlawful, there could be no probable cause to arrest Azevedo under Penal Code § 148.

### Legal Standard

"The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest."  Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009); see Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004).  "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  Rodis v. City & County of San Francisco, 558 F.3d 964, 969 (9th Cir. 2009); John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008).  Courts look to "the totality of the circumstances known to the arresting officers, to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime."  John, 515 F.3d at 940; see Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006).

For seizures that do not amount to a full arrest, police may "detain or seize an individual for brief, investigatory purposes, provided the officers making the stop have reasonable suspicion that criminal activity may be afoot."  United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009)

1   see Terry v. Ohio, 392 U.S. 1, 27, 30 (1968); Ramirez, 560 F.3d at 1020. "To determine whether

2   [an investigatory] stop was supported by reasonable suspicion, we consider whether, in light of

3   the totality of the circumstances, the officer had a particularized and objective basis for

4   suspecting the particular person stopped of criminal activity." United States v. Palos-Marquez,

5   591 F.3d 1272, 1275 (9th Cir. 2010); see Ramirez, 560 F.3d at 1021. "The reasonable suspicion

6   standard is a less demanding standard than probable cause, and merely requires a minimal level

7   of objective justification." Gallegos v. City of Los Angeles, 308 F.3d 987, 990-991 (9th Cir.

8   2002); see also Ramirez, 560 F.3d at 1020. "Conduct innocent in the eyes of the untrained may

9   carry entirely different messages to the experienced or trained observer," and thus, may form

10  "reasonable suspicion." Ramirez, 560 F.3d at 1021.

11      "The Fourth Amendment generally prohibits the warrantless entry of a person's home,

12  whether to make an arrest or to search for specific objects." Illinois v. Rodriguez, 497 U.S. 177,

13  181 (1990). In fact, "searches and seizures inside a home without a warrant are presumptively

14  unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). However, where officers have

15  probable cause to arrest, the "warrantless arrest of a suspect [who is standing in the doorway and]

16  who voluntarily opens the door of his dwelling in response to a noncoercive knock by the police"

17  does not violate the Fourth Amendment. See United States v. Vaneaton, 49 F.3d 1423, 1426-27

18  (9th Cir. 1995). Similarly, a suspect who "voluntarily opens the door of his residence in response

19  to a non-coercive 'knock and talk' request may be temporarily seized "outside the home (or at the

20  threshold) provided that [the officers] have reasonable suspicion of criminal activity." United

21  States v. Crapser, 472 F.3d 1141, 1148 (9th Cir. 2007). If the police "use no force, threats, or

22  subterfuge," a person's decision to open the door exposes that person to view, and the privacy

23  interests identified in *Payton v. New York* are not violated. Id.; see Vaneaton, 49 F.3d at 1427.

24      *Discussion*

25      There are two seizures at issue – the initial detention where the officers told Azevedo to

26  sit on the curb, and the arrest. Azevedo's opposition is premised primarily on the theory that,

27  because the front yard was curtilage, Carr acted unlawfully when he entered the front yard.

28  However, as the Court has determined, the front yard is not curtilage. Thus, Carr's entry into the

1   front yard was lawful.  Nevertheless, a lawful entry into the front yard does not end the inquiry.

2            Initial Detention

3        Under *Crapser*, a person may be temporarily seized in the doorway or outside the

4   threshold of a residence as long as there is reasonable suspicion of criminal activity and the

5   police did not use force, threats, or subterfuge to get the person to open the door or step outside

6   the threshold.  See Crapser, 472 F.3d at 1147-48; Price v. Austin Police Dep't, 2007 U.S. Dist.

7   LEXIS 39378, *29-*31 (W.D. Tex. May 31, 2007).

8        The Court does not see that Azevedo exposed himself to public view due to force, threats,

9   or subterfuge by the officers.  Prior to Azevedo exiting the home, the officers knocked on the

10  front door and, when the door opened, Carr announced "Fresno police."  Azevedo relies on

11  testimony by Carr to argue that Carr forcibly caused the front door to open.  Carr testified that he

12  knocked on the front wooden door, the door swung open, hit the wall, and remained wide open.

13  See Carr Depo. 43:21-22; see also Avila Dec. ¶ 5.  There is no evidence of how hard Carr

14  knocked on the door or how hard it hit the wall.  However, the evidence establishes that the front

15  door was missing its handle and lock set.  See DUMF 21; Carr Dec. ¶¶ 5, 8; Avila Dec. ¶¶ 3, 4.

16  Under such circumstances, it is unknown how securely the front door could remain shut.  No

17  evidence has been identified that shows how Azevedo kept the door shut, how well the door

18  functioned, or whether the door was secured in any manner besides being shut.  Carr's testimony

19  shows that he simply knocked on the door. Without a lock and handle, it is not surprising that the

20  door would swing open after someone knocked on it.  The evidence does not indicate that Carr's

21  knock was improper or excessive.

22       Once the door was open, the officers for the first time announced that they were "Fresno

23  police."  Prior to this announcement, the officers had said nothing.  Identifying themselves as the

24  police is a natural and proper response to the door opening.  There is no indication that Carr

25  announced "Fresno police" in order to verbally seize Azevedo.  Importantly, no evidence has

26  been presented that Azevedo even heard Carr identify himself.

27       The evidence shows that Azevedo was sleeping in a bedroom in the house when the

28  officers knocked on the door.  According to Azevedo, what woke him was his dog.  See Azevedo

21

Depo. 66:16-18.  Azevedo testified that he heard his dog barking, the dog ran out of the bedroom, then ran out the front door, and Azevedo heard yelling but does not know what was being said.[25] See Azevedo Depo. 66:16-69:25.  Azevedo followed quickly behind his dog and went outside the house.  See DUMF 31; PUMF 61.  The first time that Azevedo saw the officers was after Azevedo stepped out of the house.  See Azevedo Depo. at 81:5-8.  It is apparent that Azevedo exited the house because he was following after his dog – he did not exit due to anything that the officers said or did.  See Azevedo Depo. 66-69.  In other words, Azevedo did not exit the house due to force, threat, or subterfuge by the officers.  See Crapser, 472 F.3d at 1148.

With respect to probable cause, prior to entering the front yard, the officers knew that the tags on the motorcycle were expired, the VIN of the motorcycle could not be found, and about twelve days earlier the driver of this motorcycle ignored Carr's gesture to stop and instead sped away in a reckless fashion.  These are articulable, particular, and objective facts that create a reasonable suspicion that the motorcycle may be stolen.  See Palos-Marquez, 591 F.3d at 1275; Gallegos, 308 F.3d at 990.  Also, the computer indicated that the Property was possibly vacant, there was newspaper on the windows, some windows had no coverings, some windows had cloth/curtains, grass was growing up against the house, the metal security door of the house was open, there was a hole in the front door where the lock and door knob should have been, and a low light could be seen in the corner of the window.  These are articulable, particular, and objective facts that create a reasonable suspicion that either a trespass or burglary may be occurring.  See Palos-Marquez, 591 F.3d at 1275; Gallegos, 308 F.3d at 990.  At this point, the officers decided to approach the house in order to talk to someone about the motorcycle and investigate the security of the house.  See Carr Dec. ¶ 6; Avila Dec. ¶ 4.[26]  After Carr undraped

---

[25] The evidence indicates that the officers were yelling at the dog.  See PUMF 61.

[26] Again, Azevedo disputes the intent of the officers.  However, as explained in Footnote 14, *supra*, the dispute is insufficient.  Further, the Court sees no differences between the suspicions that Carr and Avila had about the possible occupant of the house, and the suspicions that the police had in *Crapser* (officer suspected that Crapser was the same "Gunner Crapser" who was the subject of a warrant), *Vaneaton* (officers believed that Vaneaton was receiving stolen property), and *Price* (officers believed Price had threatened and brandished a knife at his neighbor). In these cases, the suspects were seized at their doorsteps (although *Crapser* assumed that a seizure occurred) after they opened their doors, yet the seizures were held to be constitutional.  See Crapser, 472 F.3d at 1142, 1147-48; Vaneaton, 49 F.3d at 1424-27; Price, 2007 U.S. Dist. LEXIS 39378 at *8-*12, *29-*31.

the chain from the iron fence's front gate, see PUMF 50; Carr Depo. 45:21-47:9; Sealed Exhibit

G, the officers approached the house.  The officers saw pieces of door locks and handles, which

matched both the front door and front metal security door.  These pieces were seen on the porch

and in the flower bed next to the porch.  Additionally, a glove was seen in the flower bed next to

a door lock, which is consistent with a break-in.  These are very significant and probative facts.

The observation of the glove and locks and handles augment and further support reasonable

suspicion.  When the officers knocked on the door, they had at least reasonable suspicion that a

trespass or a burglary was being committed.  Knocking on the door in order to investigate the

house's security was appropriate and reasonable.  Cf. Frunz v. City of Tacoma, 468 F.3d 1141,

1145-46 (9th Cir. 2006) (noting that, under the facts of the case, officers "could have knocked at

the door [of the house]. . . and politely asked the occupants whether they were entitled to be

there.").  Additionally, when the door opened after Carr knocked, Azevedo's dog came out

barking and growling.  The dog was large and caused the officers to back-peddle.  The officers

had a legitimate concern for their safety.  The facts known about the motorcycle, combined with

the computer entry about the Property, the appearance of the property (the grass growing up the

house and the windows), the missing handles and locks from the front doors, the locks and

handles lying on the porch and the flower bed, and the glove in the flower bed, caused the

officers to have a reasonable suspicion that the unknown rider of the motorcycle may be

committing a trespass or burglary in the house (and possibly theft of the motorcycle).  Thus, there

was reasonable suspicion to detain Azevedo once he exited the house.  See Palos-Marquez, 591

F.3d at 1275; Crapser, 472 F.3d at 1142, 1147-48; Vaneaton, 49 F.3d at 1424-27; Price, 2007

U.S. Dist. LEXIS 39378 at *8-*12, *29-*31.  The encounter with the dog raised legitimate safety

concerns, and it was reasonable to order Azevedo to the curb, which was only a modest distance

from the house, in order to investigate.  See DUMF's 33, 34.

       Because the officers had reasonable suspicion that burglary or trespass was occurring, had

reasonable fears about their safety from the dog, and because Azevedo did not exit his house due

to force, threats, or subterfuge by the officers, Azevedo's Fourth Amendment rights were not

violated when he was seized after exiting the house.  See Crapser, 472 F.3d at 1142, 1147-48;

1 | Vaneaton, 49 F.3d at 1424-27; Price, 2007 U.S. Dist. LEXIS 39378 at *8-*12, *29-*31.

2 |      Alternatively, qualified immunity is appropriate.  The facts outlined above are strongly

3 | indicative of a trespass or burglary.  Especially probative are the computer entry about the

4 | possible vacancy of the house and the locks and gloves found on the porch and in the flower bed.

5 | Further, given *Crapser*'s discussion and approval of *Vaneaton* (in which officers had probable

6 | cause to arrest, knocked on the door, asked Vaneaton's identity, and then arrested him just inside

7 | the doorway), and the lack of force, threats, and subterfuge, a reasonable officer in Carr's

8 | position could have reasonably believed that the detention met the parameters of *Crapser*.  In

9 | short, a reasonable officer could have reasonably believed that Azevedo's detention was

10 | constitutional.  See Saucier v. Katz, 533 U.S. 194, 200-06 (2001); Crapser, 472 F.3d at 1142,

11 | 1147-48; Lawrence v. United States, 340 F.3d 952, 956-57 (9th Cir. 2003); Vaneaton, 49 F.3d at

12 | 1424-27.

13 |      Summary judgment in favor of Carr on this claim is appropriate.

14 |         <u>Arrest</u>

15 |      The elements of a Penal Code § 148(a)[27] obstruction offense are: "(1) the defendant

16 | willfully resisted, delayed, or obstructed a peace officer; (2) when the officer was engaged in the

17 | performance of his or her duties; and (3) the defendant knew or reasonably should have known

18 | that the other person was a peace officer engaged in the performance of his or her duties."

19 | People v. Simons, 42 Cal.App.4th 1100, 1108-09 (1996).  However, a person "cannot be

20 | convicted of an offense against an officer engaged in the performance of official duties unless the

21 | officer was acting lawfully at the time."  Id.

22 |      Here, there is no dispute that if a lawfully detained person runs from the police, he is in

23 | violation of Penal Code § 148.  See DUMF 42.  The dispute is whether Azevedo was lawfully

24 | detained.  As discussed above, although Azevedo argues to the contrary, the Court has found that

25 |

---

26 | [27]In pertinent part, Penal Code § 148(a)(1) reads:

27 | Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not

28 | exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

1   he was lawfully detained.  Because Azevedo was lawfully detained, Carr had probable cause to

2   arrest Azevedo once Azevedo attempted to run away.  See John, 515 F.3d at 940; Cal. Pen. Code

3   § 148(a); Simmons, 42 Cal.App.4th at 1108-09; DUMF 42.

4          Alternatively, excluding issues of excessive force, Azevedo's arrest is improper only if

5   the Terry detention was unlawful.  As discussed above, a reasonable officer could have

6   concluded that reasonable suspicion existed and that Crapser was followed.  Therefore, for the

7   same reasons, a reasonable officer in Carr's position could have reasonably believed that

8   probable cause existed to arrest Azevedo for violation of Penal Code § 148(a).  See Saucier, 533

9   U.S. at 200-06 (2001); John, 515 F.3d at 940; Lawrence, 340 F.3d at 956-57; Simmons, 42

10  Cal.App.4th at 1108-09.

11         Summary judgment in favor of Carr on this claim is appropriate.

12

13  **II.**    ***Monell* Liability**

14         *Defendant's Argument*

15         The City argues that Azevedo has identified several policies, but none of his contentions

16  have merit.  There is no evidence that the City has an unconstitutional policy regarding training,

17  as the evidence shows the City's training materials are consistent with POST[28] standards.

18  Further, officers receive on-going training through various courses, programs, and seminars.

19  Carr is certified in the use of a taser, and POST does not exclude the use of a taser against a

20  fleeing suspect.

21         Any contention that the City has an unconstitutional policy/practice of detaining and

22  arresting individuals without probable cause is not supported by the evidence.  Moreover, the

23  evidence shows that probable cause existed to arrest Azevedo.

24         Any contention that the City fails to supervise its officers is not supported by the

25  evidence.  At the time of the incident, officers were supervised through a chain of command from

26  sergeant through chief.  There was daily supervision through the chain of command, and officers

27

28         [28]POST is the "Peace Officer Standards and Training" and is recognized as the authority that governs the
training of police officers in California.  DUMF 46.

received yearly evaluations.  Further, the officers were expected to comply with department practices, training, and procedure, and are subject to discipline for failing to do so.

Similarly, there is no evidence of a failure to discipline.  Administrative staff review and examine incidents in which force is used in order to determine whether the force was reasonable under the circumstances.  It is the policy of the City to conduct thorough investigations.

Finally, any contention that the City has a custom and practice of falsifying reports and evidence is not supported by the evidence.  It has always been the policy of the City to require accurate reporting by its officers.  It has never been the policy to allow falsification.

*Plaintiff's Opposition*

Azevedo argues that there is sufficient evidence to indicate that Carr acted pursuant to an official policy.  Standing order 2.5.8 is deficient in that it instructs officers to disregard the risk of collateral injuries from an uncontrolled fall while running over a hard surface.  Standing order 2.5.8 and 2.5.10 are deficient in that they instruct officers to report taser use on an honor system, including documenting a subject's force that required the use of force, taking and reporting witness statements, but does not include downloading taser data.  Pursuant to these policies, Carr unnecessarily tasered Azevedo, invented a fact that Azevedo "reached to his waistband," altered witness statements in the force report, and did not download his taser data, knowing that no meaningful review would occur.  Also, it is clear that the City had alternatives to these policies.  Taser International's materials warn of risks due to uncontrolled falls.  It is also well established that officers should be sequestered if they are involved in a significant use of force, and should not conduct their own use of force investigation.

Azevedo argues that there is also evidence of a longstanding custom of the City using a taser to seize fleeing subjects who were unarmed, non-threatening, and who had not committed serious crimes.  In addition to this case, Carr and Avila combined to taser six such subjects, and the conduct of the officers was approved.

Azevedo also argues that there is a dispute regarding the failure to train on the proper use of a taser, that is, that the taser should not be used on a non-felony suspect who posses no imminent threat to anyone's safety, but is merely running away.  The facts of this case, Carr's

1   testimony, Avila's testimony, both officers' multiple use of taser on people like Azevedo, and the

2   statements and approval of other City police officers indicating that such use is in line with

3   training and guidelines.   Further, there is no question that encounters with suspects who flee

4   over hard surfaces is something that can be expected to occur relatively frequently.  Taser

5   International's own materials and warnings show that the occurrence and danger associated

6   therewith are obvious.

7           Finally, Azevedo argues that the evidence indicates that Police Chief Dyer ratified Carr's

8   conduct.  Despite the obvious inadequacy of the investigation, Dyer (through his delegate Deputy

9   Chief Nevarez) approved the determination that Carr should be "exonerated" of the excessive

10  force claim.  Although failure to discipline by itself is insufficient, the failure to discipline

11  combined with the obvious inadequacies of the investigation and the outrageous conduct of Carr,

12  is sufficient to support a finding that Dyer, and thus the City, ratified Carr's conduct.

13          *Legal Standard*

14          Municipalities are considered "persons" under 42 U.S.C. § 1983 and therefore may be

15  liable for causing a constitutional deprivation.  Monell v. Department of Soc. Servs., 436 U.S.

16  658, 690 (1978); Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).  A

17  municipality, however, "cannot be held liable solely because it employs a tortfeasor – or, in other

18  words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat*

19  *superior* theory."  Monell, 436 U.S. at 691; see Long, 442 F.3d at 1185; Ulrich v. City & County

20  of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).  Liability only attaches where the

21  municipality itself causes the constitutional violation through "execution of a government's

22  policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

23  said to represent official policy."  Monell, 436 U.S. at 694; Ulrich, 308 F.3d at 984.  Municipal

24  liability may be premised on: (1) conduct pursuant to an expressly adopted official policy; (2) a

25  longstanding practice or custom which constitutes the 'standard operating procedure' of the local

26  government entity; (3) a decision of a decision-making official who was, as a matter of state law,

27  a final policymaking authority whose edicts or acts may fairly be said to represent official policy

28  in the area of decision; or (4) an official with final policymaking authority either delegating that

1    authority to, or ratifying the decision of, a subordinate.  See Price v. Sery, 513 F.3d 962, 966 (9th

2    Cir. Or. 2008); Lytle v. Carl, 382 F.3d 978, 982 (9th Cir. 2004); Ulrich, 308 F.3d at 984-85;

3    Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1995).

4          A "custom" for purposes of municipal liability is a widespread practice that, although not

5    authorized by written law or express municipal policy, is so permanent and well-settled as to

6    constitute a custom or usage with the force of law."  City of St. Louis v. Praprotnik, 485 U.S.

7    112, 127 (1988); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 890 (9th Cir.

8    1990).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it

9    must be founded upon practices of sufficient duration, frequency and consistency that the

10   conduct has become a traditional method of carrying out policy."  Trevino, 99 F.3d at 918.  A

11   "policy" is a deliberate choice to follow a course of action . . . made from among various

12   alternatives by the official or officials responsible for establishing final policy with respect to the

13   subject matter in question."  Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008)

14         In order to show ratification, a plaintiff must show that the "authorized policymakers

15   approved a subordinate's decision and the basis for it." Praprotnik, 485 U.S. at 127; Lytle, 382

16   F.3d at 987; Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999).  Neither the mere failure to

17   overrule a subordinate's actions, nor the mere knowledge of an unconstitutional act by

18   themselves can constitute ratification.  Lytle, 382 F.3d at 987; Christie, 176 F.3d at 1239; Gillette

19   v. Delmore, 979 F.2d 1342, 1348 (9th Cir. 1992).  Instead, the "policymaker must have

20   knowledge of the constitutional violation and actually approve of it."  Lytle, 382 F.3d at 987.  A

21   single failure to discipline an officer, without something more, is insufficient to establish

22   ratification.  See Haugen v. Brosseau, 339 F.3d 857, 875 (9th Cir. 2003)[29]  (citing and

23   parenthetically discussing Santiago v. Fenton, 891 F.2d 373, 382 (1st Cir. 1989)); Kanae v.

24   Hodson, 294 F. Supp. 2d 1179, 1191 (D. Haw. 2003)  Although the plaintiff must establish that

25   there is a genuine issue of material fact, generally "ratification is a question for the jury."

26   Christie, 179 F.3d at 1238-39; Fuller v. City of Oakland, 47 F.3d 1522, 1534 (9th Cir. 1995).

27

28

---

[29]Overruled on other grounds, Brosseau v. Haugen, 543 U.S. 194 (2004).

1   A municipality's failure to train its employees may create § 1983 liability where the

2   "failure to train amounts to deliberate indifference to the rights of persons with whom the

3   [employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989); Long, 442

4   F.3d at 1186; Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001). "The issue is

5   whether the training program is adequate and, if it is not, whether such inadequate training can

6   justifiably be said to represent municipal policy." Long, 442 F.3d at 1186. A plaintiff alleging a

7   failure to train claim police officers must show:  (1) he was deprived of a constitutional right, (2)

8   the municipality had a training policy that "amounts to deliberate indifference to the

9   [constitutional] rights of the persons' with whom [its police officers] are likely to come into

10  contact;" and (3) his constitutional injury would have been avoided had the municipality properly

11  trained those officers.  Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007); Lee,

12  250 F.3d at 681.  A municipality is "deliberately indifferent" when the need for more or different

13  action, "is so obvious, and the inadequacy [of the current procedure] so likely to result in the

14  violation of constitutional rights, that the policymakers … can reasonably be said to have been

15  deliberately indifferent to the need." City of Canton, 489 U.S. at 390; Lee, 251 F.3d at 682.  A

16  "pattern of tortious conduct," despite the existence of a training program, or "highly predictable"

17  constitutional violations due to a "failure to equip law enforcement officers with specific tools to

18  handle recurring situations," are circumstances in which liability for failure to train may be

19  imposed.  See Board of County Comm'rs v. Brown, 520 U.S. 397, 407-10 (1997); Long, 442

20  F.3d at 1186-87.  However, "adequately trained officers occasionally make mistakes; the fact that

21  they do says little about the training program or the legal basis for holding the [municipality]

22  liable." City of Canton, 489 U.S. at 391.  "Mere proof of a single incident of errant behavior is a

23  clearly insufficient basis for imposing liability on the County." Merritt v. County of Los

24  Angeles, 875 F.2d 765, 770 (9th Cir. 1989); see also McDade v. West, 223 F.3d 1135, 1141 (9th

25  Cir. 2000).

26      *Discussion*

27      For there to be *Monell* liability against the City on the policies/practices identified by

28  Azevedo, there must also be a finding that excessive force was used.  Cf. Los Angeles v. Heller,

29

1   475 U.S. 796, 799 (1986) (holding no *Monell* liability in the absence of a constitutional

2   violation); Long v. City & County of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007) (same).

3   However, no party has moved for summary judgment on Azevedo's excessive force claims.

4   Therefore, in order to resolve the summary judgment motion on the *Monell* issue, the Court must

5   and will assume that excessive force was used against Azevedo.  Under this assumption, and

6   viewing the evidence in the light most favorable to Azevedo as the non-moving party, there are

7   genuine disputes of material fact on the *Monell* claim.

8                          Conduct Pursuant to Official Policy

9            Azevedo focuses on Standing Order ("SO") 2.5.8 and SO 2.5.10 in arguing that

10  constitutional violations occurred pursuant to an "official policy."  See Court's Docket Doc. No.

11  41 at pp. 19-20.

12           First, relying on PAUMF's 79, 80, and 81,[30] Azevedo states that Standing Orders 2.5.8

13  "instructed officers to disregard the risk of collateral injuries from an uncontrolled fall while

14  running over a hard surface."  Id. at 19:13-15.   Carr testified that he believed that he followed

15  SO 2.5.8 on the night in question.  See Carr Depo. 99:20-22; see also PAUMF 80.  However, the

16  pertinent portion of SO 2.5.8 reads, "The [taser] should not be used on a subject whose position

17  or activity may result in collateral injury (e.g. falls from height, falls into a body of water that

18  presents a drowning risk, operating vehicles)."  PAUMF 79.  Azevedo's assertion about SO 2.5.8

19  does not match the policy's language.  There is nothing that instructs officers to disregard the

20  possibility of uncontrolled falls over a hard surface.  In fact, SO 2.5.8 instructs officers to be

21  cognizant of collateral injuries due to a subject's position or activity, which would seem to entail

22  running over a hard surface.  If SO 2.5.8 actually instructed officers to disregard the uncontrolled

23  falls over hard surfaces, there would be a significant problem.  But the order does not, and

24  Azevedo presents no evidence that shows SO 2.5.8 is interpreted as directing officers to

25

26

27           [30]Citing Carr's deposition at 99:23-100:7, PAUMF 81 reads that Carr believed that SO 2.8.5 did not apply
     unless a person was on a balcony, rooftop or staircase, and not when someone is running at full speed.  This PAUMF
28   does not aid Azevedo.  First, that section of deposition testimony has nothing to do with instructions to disregard
     uncontrolled falls over hard surfaces.  See Carr Depo. 99:23-100:7.  Second, the cited deposition section appears to
     the Court to focus more on the meaning and application of the term "fall from height."

1   disregard uncontrolled falls over hard surfaces.  Because SO 2.5.8 does not  instruct officers to

2   disregard the possibility of uncontrolled falls as Azevedo contends, there is no *Monell* liability

3   based on this aspect of SO 2.5.8.  Summary judgment on this *Monell* theory is appropriate.

4          Second, relying on PAUMF's 86, 87, and 88,[31] Azevedo states that SO 2.5.8 and SO

5   2.5.10 instruct officers who use force to follow the "honor system," including documenting

6   behavior that required the use of force and taking and reporting witness statements.  To the extent

7   that Azevedo is complaining about the officer documenting why he believed that the particular

8   force used was required, the Court sees no problem with such a practice and Azevedo does not

9   explain why such a procedure is problematic.  Including the officer's explanation of why he used

10  force seems both reasonable and desirable.  Further, if by "honor system" Azevedo is criticizing

11  that the officer who used force is required to self-report his use of force, there is no explanation

12  of why this is an improper practice and there is no indication that Azevedo was harmed as a

13  result of that practice because Carr in fact reported using force.

14         However, Azevedo has a more substantial point regarding the policy of requiring the

15  officer who used force to also obtain witness statements.  Azevedo's police procedures expert,

16  Roger Clark, has declared: "Contrary to proper procedure, the Fresno Police Department

17  endorsed Officer Carr conducting his own use of force witness interviews.  Because of the

18  *serious injuries that occurred*, FPD should have required supervisors on the scene to sequester

19  Carr and Avila, take their separate statements, and then assign other investigators to take the

20  statements of civilian witnesses."  Clark Dec. ¶¶ 15-16 (emphasis added).  Neither SO 2.5.8 nor

21  SO 2.5.10 discuss situations in which the officer who used force should not interview

22  eyewitnesses.  See Sealed Exhibits H, I.  Clark's opinion is augmented because there is an issue

23  regarding a witness's statement in this case.  Eyewitness Ramon Ramirez testified during his

24  deposition that he saw an officer, i.e. Carr, hit Azevedo with a flashlight.  See Ramirez Depo.

25  28:11-24.  Ramirez also stated that he was interviewed by an officer and he told the officer about

26

27

28         [31]PAUMF 86 states that SO 2.5.8 and SO 2.5.10 require an officer who used the force to interview
    witnesses and write the report.  PAUMF 87 states that SO 2.5.10 requires officers to document the behavior that
    required the use of force.  PAUMF 88 deals with taser data downloads.

1  seeing Azevedo getting hit with the flashlight.  See id. at 29:15-22.  Carr's report indicates that

2  he interviewed Ramirez, and Carr's deposition testimony suggests that the Carr did so alone.  See

3  Carr Depo. 102:17-21; Sealed Exhibit E.  Carr's report does not include anything regarding the

4  flashlight.  See Sealed Exhibit E.  Again, assuming that excessive force was used, the policy that

5  Carr followed allowed him to selectively report and omit evidence.[32]  It is possible that an officer

6  could think that he could cover-up excessive force by utilizing this interview process and

7  omitting evidence.  In light of Clark's declaration that the *severity* of the injuries required

8  sequestration, the policies identified by Azevedo, and the specific incident with Ramirez's

9  statement, the Court believes that there is a genuine dispute of material fact regarding the policy

10  of requiring officers who use force that results in severe injury to conduct their own witness

11  interviews.  Summary judgment on this *Monell* theory will be denied.[33]

12      Lastly, citing PAUMF 89, Azevedo argues that SO 2.5.8 and SO 2.5.10 require no

13  meaningful review of taser deployments by supervisors or others.  PAUMF 89 states, the "only

14  administrative review of taser deployments pursuant to FPD's written policies is a short form to

15  be completed by the involved officer's direct supervisor based solely on the officer's report, and

16  forwarded to various individuals."  PAUMF 89 is supported by citations to SO 2.5.8, SO 2.5.10,

17  and the use of force form/report that was filled out by Carr's supervisor, Sgt. Brown.  However,

18  Azevedo's argument is conclusory.  There is no citation to expert opinions, no explanation of

19  why the City's review procedures "require no meaningful review," no explanation of what

20  "meaningful review" should have been done, and it is not clear that the use of force report

21  completed by Sgt. Brown is based "solely" on Carr's version of events.  Cf. DUMF 57.  In fact,

22

23

24      [32]The Court is not holding that the City has a policy of tolerating officers falsifying reports.  See DUMF 58.

25      [33]In reply, the City argues that it is impractical and unreasonable to sequester an officer every time he uses
26  force against a suspect.  The Court agrees.  However, Clark has declared that the severity of the injuries Azevedo
    suffered required sequestration.  The Court is not holding that a policy of having the officer who used force also
27  interview witnesses is *per se* improper.  The Court is merely holding that, because expert testimony has stated that
    the injuries were sufficiently severe, the particular policies presented to the Court (SO 2.8.5 and SO 2.5.10) do not
28  contain exceptions to who conducts the interviews, and it appears Ramirez statement was not accurately taken, a
    genuine dispute has been created.

1    the report indicates that Brown spoke to Azevedo.  See Sealed Exhibit K.[34]  Azevedo's argument

2    is inadequately developed.  Summary judgment on this *Monell* theory is appropriate.

3                                  Longstanding Practice or Custom

4            Azevedo argues that the City has a custom of using tasers on unarmed, nonthreatening

5    suspects who are running on hard surfaces.  Azevedo relies on PAUMF's 107, 108, 109, and 110.

6    PAUMF's 107, 108, and 110 are undisputed and indicate that "Carr had previously used his taser

7    on at least two unarmed people who were running away over a hard surface and not reaching for

8    their waistbands," PAUMF 107, the taser was ineffective on one person, but the taser was

9    effective on the other and that person lost muscle control and fell forward, see PAUMF 108, and

10   Carr reported the incident of the person who fell forward.  See PAUMF 110.  It is also

11   undisputed that Avila testified that he had previously used his taser approximately three times on

12   people who were running away.  See Avila Depo. 52:17-22; see also PAUMF 109.

13           The PAUMF's and the evidence cited do not establish a custom or longstanding practice.

14   As to Carr's testimony, all that is shown is that the suspects were not armed, were not reaching

15   for waistbands, were running full speed on a hard surface, and one fell forward on the hard

16   surface.  See Carr Depo. 86:12-87:14.  As to Avila's testimony, all that is shown is that the other

17   incidents involved suspects who were running away.  See Avila Depo. 52:17-22.  The problem is

18   that there is insufficient detail.  The deposition testimony does not establish what crimes were at

19   issue, whether the suspects had been assaultive, or whether they posed a danger to those in the

20   area.  Moreover, with Avila's testimony, it is completely unknown whether the suspects were

21   even running over hard surfaces.  It is undisputed that POST standards allow for the use of taser

22   on a fleeing suspect, depending on the totality of the circumstances.  See Clark Depo. 64:20-25.

23   Similarly, one of the express considerations in examining whether the use of a taser was

24   reasonable is whether the suspect was actively resisting *or fleeing*.  See Bryan v. McPherson, 590

25   F.3d 767, 775, 780-81 (9th Cir. 2009).  The other incidents Azevedo relies upon have not been

26   shown to be sufficiently similar to this case, and the single incident of this case does not establish

27

28           [34]The use of force form/report was made by Sgt. Brown and was reviewed and approved by a lieutenant, a
     captain, and a deputy chief.  See Sealed Exhibit K.

1    a custom.  Trevino, 99 F.3d at 918.  Summary judgment on this *Monell* theory is appropriate.

2                                   Failure To Train/Enact Policy

3            The Court agrees with Azevedo that there is a triable issue of fact regarding training.

4    There is no dispute that the City has a unit to ensure that its training is POST compliant.  See

5    DUMF 47.  However, Azevedo's expert, Roger Clark, has indicated that the training does not

6    include or sufficiently address the issue of potential injuries from someone who falls

7    uncontrollably onto a hard surface due to a taser application.  See Clark Depo. 64:10-19;[35] Clark

8    Dec. ¶¶ 4, 9-13.  Clark has also declared that a "person running away at full speed over a hard

9    surface is a situation encountered by urban law enforcement departments on a relatively frequent

10   basis."  Clark Dec. ¶ 17.  In addition to Clark's opinion, Azevedo rightly points out that Carr's

11   use of force, i.e. using a taser on Azevedo while running full speed over a hard surface, was

12   reviewed and approved by multiple City police officers, including a sergeant, a lieutenant, a

13   captain, and the deputy chief.  See PAUMF 95.  A retired sergeant also stated that Carr's conduct

14   was within guidelines and training.  See PAUMF 111.  Because the Court must assume excessive

15   force was used, a reasonable jury could look at the number of separate officers who concluded

16   that the use of force/the taser while Azevedo was running over a hard surface was proper is

17   indicative of inadequate training.  Cf. Alexander v. City & County of San Francisco, 29 F.3d

18   1355, 1368 (9th Cir. 1994) (noting that, had evidence been timely submitted and developed,

19   testimony from a particular sergeant that conduct was pursuant to policy and training might

20   indicate department-wide inadequacy of training); Russo v. Cincinnati, 953 F.2d 1036, 1046-47

21   (6th Cir. 1992).  Clark also opines that appropriate training regarding the dangers of uncontrolled

22   falls on a hard surfaces was available and known to the City through Taser International.  See

23   Clark Dec. ¶¶ 12-14; Fattahi Opp. Dec. ¶ 17 & Sealed Exh. N.  It is not a stretch to infer that, had

24   there been training that emphasized the dangers of uncontrolled falls on hard surfaces, Carr may

25   _____

26          [35]DUMF 50 posits that the City's taser training was POST compliant.  DUMF 50 cites potions of Clark's
     testimony.  It is not clear whether the cited depositions excerpts are referring to the training regarding "use of force"
27   in general or use of the taser in particular.  See Clark Depo. 62:12-63:22, 68:11-22.  Nevertheless, on page 64, Clark
     specifically states that the training materials do not "talk about" injuries from falling on a hard surface due to taser
28   application in response to a question about POST.  See Clark Depo. 64:10-19.  Page 64 of Clark's deposition,
     combined with Clark's declaration, lead to the conclusion that DUMF 50 is disputed.

not have used his taser.  The cumulative effect of this evidence makes summary judgment on this theory inappropriate.

### Ratification

Azevedo agrees that a failure to discipline alone is not sufficient to show ratification.  Instead, citing *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) and *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985), Azevedo argues that an inadequate investigation and/or outrageous conduct by Carr can combine with the failure to discipline and show ratification.

With respect to outrageous conduct, Azevedo relies on *Grandstaff*.  In that case, six officers (the entire night shift of the City of Borger) followed a suspect to a ranch in the course of a chase in which guns were fired.  See id. at 165.  Grandstaff worked at the ranch, saw the police, and drove down to see what was happening.  See id.  Grandstaff heard what was happening over the police loudspeakers, drove back to his house, told his family to stay inside, and drove back to the officers for a second time in order to help.  See id.  When Grandstaff reached the officers, they all opened fire on Grandstaff's truck.  See id.  Grandstaff somehow managed to get out of the truck, but as he was running away, he was shot in the back and died shortly thereafter.  See id.  Following the incident, the City of Borger and the police department denied any and all wrongdoing, issued no reprimands, and made no changes in their policies.  See id. at 171.  The outrage and disgust of the Fifth Circuit blazes from the pages.  The situation in *Grandstaff* is nothing short of appalling.  However, what happened in the case at bar is not nearly as outrageous as *Grandstaff*.  In the case at bar, a taser was used against a person who was fleeing from officers over a hard surface and who had yet to explain his presence in/connection to a house where the evidence suggested a possible burglary.  The Court realizes there is a dispute among the parties regarding the propriety of the force used.[36]  A jury may well conclude that the force used was excessive.  However, without downplaying the events or Azevedo's extensive facial injuries, what occurred on November 7 does not rise to the same level of outrageousness as *Grandstaff*.  Carr's use of force was not sufficiently outrageous to show that the failure to

---

[36]The Court emphasizes that it is making no determination regarding excessive force or whether Azevedo was reaching for/into his waistband.

discipline was a ratification of Carr's conduct.

With respect to an inadequate internal affairs investigation, Azevedo relies on *Larez*. In *Larez*, the Ninth Circuit noted that expert testimony stated that the investigation contained holes and inconsistencies that should have been "readily visible to any reasonable police administrator," such as relying on testimony from an officer who was not present during some of the incidents. See *Larez*, 946 F.2d at 647. Azevedo identifies seven shortcomings in the internal affairs investigation. However, unlike *Larez*, Azevedo has pointed the Court to no expert opinion regarding the obviousness or egregiousness of the shortcomings, and it is not clear to the Court that these shortcomings are even shortcomings at all, or would be obvious to Chief Dyer/a reasonable police administrator.

First, Azevedo cites portions of one page of the internal affairs interview with Carr to argue that the questions were improper and leading. See PAUMF 121 (citing Sealed Exhibit F at 9:7-24). However, those sections contain only two questions, and it is unknown whether Dyer did or even should have reviewed the transcripts, versus relying on the report itself. Second, Azevedo contends that the summary of Ramon Ramirez's and other witnesses' testimony is essentially the same as that found in Carr's report. However, the investigator stated the date and time that he interviewed the witnesses, and the Court does not see how a similarity in versions, especially since some witnesses stated that they had nothing to add, would be clearly indicative of an improper investigation to a reasonable administrator. Third, Azevedo states that there were no audio recordings of the witness statements. However, there is no evidence that audio recordings must be utilized when taking a statement. Fourth, there was no reference to objective evidence such as taser data or medical records, which would have substantiated Azevedo's claims. However, it is unknown what the Taser data would have shown since Carr stated that he used the taser, and Sgt. Brown's force report stated that taser darts were recovered, one from Azevedo's skin and one from Azevedo's clothes. See Sealed Exhibit K. Also, Azevedo has submitted no medical opinions regarding what the medical records would have revealed or whether the injuries would have been inconsistent with falling front first onto cement. Fifth, Azevedo states that Carr's allegation about Azevedo reaching into/towards his waistband while

running is a fact that did not appear in Avila's statement, Brown's use of force report, or Carr's

original report.  Azevedo is correct that Sgt. Brown's use of force report does not include

Azevedo reaching to his waistband while running.  However, the synopsis of Avila's internal

affairs statement indicated that he was running behind Carr and was trying to keep up; in other

words, the report suggests an obscured view.  Further, Carr's report states that Azevedo brought

his (Azevedo's) hands in front of him (Azevedo) while they were running, and then the report

references Azevedo reaching towards his waist while he was on the curb.[37]  See Sealed Exhibit E.

This is very similar to an assertion of reaching towards the waistband.  Sixth, Azevedo argues

that he was not assaultive or combative, but the City taser policy limits taser use to combative

subjects.  However, the cited taser policy reads that the taser should be considered if it would

"assist in the [seizure] of a combative subject *and/or* would reduce the risk of injury to

department members . . . ."  PAUMF 93 (emphasis added).  The internal affairs report concluded

that officer safety, due to the alleged attempts by Azevedo to reach into his waistband, made use

of the taser appropriate.  This conclusion is not inconsistent with the policy identified by

Azevedo since that  policy's plain language does not limit its application to combative persons.[38]

See id.  Finally, Azevedo concludes that the report recommending exoneration despite a lack of

evidence to support that conclusion.  However, the synopsis of the various officers and witness

statements provide at least a colorable basis for exoneration.

        In summary, the conduct in this case is not close enough to the outrageous conduct of

*Grandstaff.*  Also, in the absence of expert opinion, Azevedo has not adequately shown that the

shortcomings of the Internal Affairs investigation are sufficiently material or would have been

readily visible to a reasonable administrator.  Cf. Larez, 946 F.2d at 647.  As such, Azevedo has

simply shown a failure to discipline, which he agrees is alone insufficient.  Accordingly,

summary judgment on Azevedo's ratification theory is appropriate.  See Lytle, 382 F.3d at 987;

Haugen, 339 F.3d at 875; Christie, 176 F.3d at 1239; Santiago, 891 F.2d at 382; Kanae, 294

---

[37]Again, the Court realizes that there is a dispute regarding whether Azevedo reached into or towards his waistband at any time.

[38]Also, no evidence has been presented that the policy is interpreted to be limited to combative individuals.

1   F.Supp.2d at 1191.

2

3   **III.**   **Spoliation**

4      *Plaintiff's Argument*

5      Azevedo argues that Defendants despoiled evidence and should be sanctioned.  In July

6   2009, Defendants sent Carr's taser to Taser International ("TI") for repair, but did not download

7   usage data from the taser unit.  TI confirmed that once they received the taser unit, they

8   determined that the unit could not be repaired and instead destroyed the unit.  The usage data was

9   relevant and highly probative.  Carr had heard that the injuries were not consistent with falling

10  and knew that his taser kept track of deployment data.  Ramon Ramirez stated that he saw Carr

11  strike Azevedo in the head with a flashlight and told Carr about this observation.  Azevedo

12  testified that he felt "jiggly" while running, but broke his fall only to be picked up and dropped

13  on his face, which caused him to black-out.  Azevedo suffered significant injuries and required

14  surgery to repair facial fractures.  A jury could find that Carr never tasered Azevedo but instead

15  struck him with a flashlight and then used additional force to incapacitate him, or that several

16  taser applications were used after Azevedo was incapacitated, or some combination thereof.

17  These factual disputes could have been conclusively established by the taser data, as it was the

18  best evidence of whether, when and how many times Carr used the taser on Azevedo.

19  Defendants took no steps to preserve this data.  Instead, they intentionally destroyed it.  Azevedo

20  argues that the prejudice he now suffers is paramount.  He was incapacitated by whatever force

21  was used to end his flight, everything "went black," and he awoke with major injuries.  None of

22  the percipient witnesses saw the taser used, but it was night and they were some distance away.

23  If Azevedo had the taser data, he argues that he could have established that unreasonable force

24  was used.  His task now is more difficult because he admits that he fled from the officers and has

25  a felony conviction.  A default finding against Defendants on the excessive force claim is

26  appropriate.  Alternatively, an adverse inference instruction, and simultaneous exclusion of

27  defense evidence of the force they claim was used, may be ordered.

28

38

1

*Defendant's Opposition*

2      Defendants argue that sanctions are inappropriate.  It is not obvious that Carr's taser data

3  was highly relevant.  Azevedo never requested that the data be preserved, including when he sent

4  his first request for production.  Carr documented one taser application, and there is no evidence

5  that more than one application was used.  Prior to this motion, there was no reason to think that

6  the taser data was potentially relevant because there was no question that the taser was used.

7  Without questioning that the taser was used, the taser data's relevance is unclear. The loss of the

8  data was inadvertent, and Azevedo can still make out a case based on his testimony, neighbor

9  witnesses, medical testimony, and photographs.  Loss of the taser data does not impair Azevedo's

10 case.

11     *Legal Standard*

12     Court's have the inherent authority to impose sanctions against a party for the destruction

13 or spoliation of relevant evidence.   Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir.

14 2006); Medical Lab. Mgmt. Consultants v. ABC, 306 F.3d 806, 824 (9th Cir. 2002); Glover v.

15 BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993).  A party engages in spoliation of evidence "as a

16 matter of law only if [the party] had 'some notice that the documents were potentially relevant' to

17 the litigation before [the evidence was] destroyed."  United States v. Kitsap Physicians Serv., 314

18 F.3d 995, 1001 (9th Cir. 2002).  "A party does not engage in spoliation when, without notice of

19 the evidence's potential relevance, it destroys the evidence according to its policy or in the

20 normal course of business."  United States v. $40,955.00, 554 F.3d 752, 758 (9th Cir. 2009).

21 The sanctions imposed for spoliation should be based upon, and take into account, the specific or

22 unique facts of the particular case.  See Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg.

23 Corp., 982 F.2d 363, 369 (9th Cir. 1992) (citing with approval Welsh v. United States, 844 F.2d

24 1239, 1246-47 (6th Cir. 1988)).  Among the sanctions available to a court are default of a claim

25 or defense, preclusion of evidence, an adverse inference instruction, and monetary sanctions.  In

26 re Napster, Inc. Copyright Litig., 462 F.Supp.2d 1060, 1078 (N.D. Cal. 2006).

27      Dismissal or default "under a court's inherent powers is justified in extreme

28 circumstances, in response to abusive litigation practices, and to insure the orderly administration

of justice and the integrity of the court's orders."  Halaco Engineering Co. v. Costle, 843 F.2d 376, 380 (9th Cir. 1988).  "Before imposing the 'harsh sanction' of dismissal, however, the district court should consider the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."  Leon, 464 F.3d at 958.

Generally, preclusion of evidence is appropriate when the admission of such evidence would "unfairly prejudice an opposing party" because of the spoliation.  Unigard, 982 F.2d at 368; In re Napster, 462 F.Supp.2d at 1078.

"Short of excluding the disputed evidence, a trial court also has the broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior."  Glover, 6 F.3d 1318 at 1329; see Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991).  The adverse inference is based on two rationales, one evidentiary and one deterrent.  Akiona, 938 F.2d at 161.  "The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document."  Id.  The deterrent rationale seeks to use the inference to deter "parties from destroying relevant evidence before it can be introduced at trial."  Id.  However, a "party should only be penalized for destroying documents if it was wrong to do so, and that requires, at a minimum, some notice that the documents are potentially relevant."  Id.  "[W]hen relevant evidence is lost accidentally or for an innocent reason, an adverse inference from the loss may be rejected."  Medical Lab., 306 F.3d at 824.  The availability of other sources or types of evidence, in addition to the despoiled evidence, may be considered by a court in determining if a sanction is warranted.  See id. at 824-25.

### Relevant Deposition Testimony

In relevant part, Azevedo testified:

**A:       . . . But I know when I fell, I fell – I didn't fall – land on my face.  I caught myself even after being electrocuted.  That's why I got scrapes – got scars**

40

1    **right – one right there and one right there.  Both where I caught – where I actually caught myself from falling all the way on my face.**

2

3    Q:    Do you remember being tazed?

4    **A:    Vaguely.  I don't actually recall where now.  But I remember it kind of made me feel like jiggly, and I fell down.**

5    Q:    Did you fall forward?

6    **A:    Yeah, I fell forward.**

7    Q:    Okay.  And what were your arms doing when you fell forward?

8    **A:    I went, like, to break my fall.  Even – even though I just put my arms forward, and so I wouldn't hit the ground.  But I broke my fall from hitting directly full face – excuse me, from face first.**

9

10   Azevedo Depo.:92:3-21.[39]  Azevedo was subsequently asked:

11   Q:    So do you remember actually hitting the ground?

12   **A:    Yes, I was still conscious.**

13   Q:    And describe what happened when you fell.

14   **A:    I just fell.  I broke my fall.  I felt like I got picked up, and then I hit the ground and everything went black.  I don't remember after that.**

15

16   Q:    And when you say you felt like you got picked up, where were you picked up?

17   **A:    It felt like somebody had, like, grabbed my belt loop and picked me up by my back end right here, and I felt like they dropped me and everything went black.**

18

19   Q:    How far off the ground did you go?

20   **A:    I don't know.  I don't know.  I felt like I'd been lifted up.  And I was off the ground.  I know I was not imaginarying [sic] it.  And I hit the ground and everything went black.**

21

22   Azevedo Depo. 93:21-94:15.

23   *Discussion*

24       The Court will not enter a default order against Defendants on Azevedo's excessive force claim.  The Court does not see a disobedience of its orders, "abusive" conduct by Defendants, or

25   extreme and outrageous behavior.  See Halaco, 843 F.2d at 380.  Azevedo's evidence from TI

26   indicates that the taser was sent to them on July 21, 2009, for "warranty repair work," the taser

27

28       [39]Azevedo also described "getting zapped," and getting "shot with electricity."  Azevedo Depo. 88:16-17, 93:3.

unit was not repairable, the unit was scrapped pursuant to policy, and the City was sent a replacement unit two days later on July 23, 2009.  See Fattahi Exhibit O.  The letter from TI indicates negligence, not bad faith.  Without contrary evidence, it simply appears that Carr's taser was worn out, which is not surprising considering the incident with Azevedo occurred in November 2007.  Further, Carr admitted that he deployed his taser, Avila confirmed that Carr deployed the taser, significantly the use of force sheet filled out by Sgt. Brown indicates that taser darts were recovered from Azevedo's person (one dart in the skin and one dart in the clothes), and as listed above Azevedo in his deposition indicated that he was tasered.  See Sealed Exhibits E, G, K; Azevedo Depo. 88:16-17, 92:3-93:3.  It is true that the taser data would likely have definitively established whether the taser was in fact used.  It appears that the question of whether the taser was actually used is based exclusively on Ramon Ramirez's testimony.  However, as shown above, Ramirez's testimony appears contrary to Azevedo's own testimony which acknowledges that it was the taser that brought him down to the ground.  The loss of the taser data does not prevent Azevedo from utilizing Ramon Ramirez at trial.[40]  Similarly, Azevedo has not shown how the loss of the taser data prevents him for establishing excessive force.  Azevedo still has his own testimony, photographs, medical testimony, and his expert witness.  Default is a very harsh sanction, and the Court does not see that the rationale for its use applies in the circumstances of this case.  See Halaco, 843 F.2d at 380.

          With respect to the requested lesser sanction, for similar reasons, the Court does not believe that precluding evidence of "the type and amount of force [the officers] used," see Court's Docket Doc. No. 32 at p. 22:9-10, would be appropriate.  The Court agrees with Defendants that the inference requested by Azevedo, i.e. that the jury may infer that excessive force was used, when combined with the preclusion of evidence by the defense regarding the type of force that the officers employed, is tantamount to a directed verdict.  In terms of prejudice, as discussed above, Azevedo still has his own testimony, Ramirez's testimony, his expert's testimony, photographs, and medical evidence which may show excessive force.  Azevedo may

---

[40]The Court notes that if the taser was not used, then Azevedo has no Monell claims based on the use of a taser against someone who is running on a hard surface.

be prejudiced in that, due to his black-out, he is unable to show that he was tasered multiple times.  However, Azevedo has pointed the Court to no evidence that actually indicates that multiple taser applications were used.  Further, the black-out may affect the damages that could be recovered since Azevedo cannot recall anything after the black-out, which would include the pain of additional taser applications.  Further, the evidence regarding *Monell* liability seems to generally focus on a single taser application.  Roger Clark is critical of firing the taser against a person who was running on a hard surface.  Precluding the Defendants from offering evidence of the force used would not permit them to answer Clark's testimony/opinions.  The preclusion that Azevedo seeks would tip the scale too far in his favor relative to the evidence that was lost.  The Court will not grant Azevedo's requested preclusion.  Cf. Unigard, 982 F.2d at 368.

Having said this, the Court is troubled by the destruction of the taser data.  A rebutable inference regarding the destruction of the taser may be appropriate.  However, because Azevedo has not expressly requested this remedy, the Court will not make a ruling at this time.  Instead, the Court will allow Azevedo, if he so chooses, to argue for a rebutable inference through a motion in limine.

## CONCLUSION

The parties have filed cross motions for summary judgment regarding the officers' entry into the Property's front yard and Azevedo's detention.  The issues of standing, curtilage, initial detention, and arrest are encompassed by these cross motions.

With respect to standing, Azevedo's testimony identifies the person who gave him permission, the reasons and circumstances behind that permission, and that he was able to exclude the owner from the property.  The owner, Coria, indicated that Azevedo excluded him from the property and that Abraham, the person identified by Azevedo, rented the Property.  No evidence from Abraham was presented.  The evidence is more than a bare assertion of "overnight guest status."  However, the evidence presented could allow reasonable juries to reach different conclusions.  The evidence does not show standing or a lack there of as a matter of law.  Both motions on this issue will be denied.

1   As to curtilage, the evidence shows only that the front yard was enclosed and was close to

2   the house.  There was inadequate evidence of any intimate or private use, there were separate

3   demarcations/fences within the Property, and there were no efforts to obstruct observation of the

4   front yard.  Therefore, the front yard is not curtilage.  Summary judgment in favor of Defendants

5   on this issue will be granted.

6   As to the initial detention of Azevedo, that is having him sit on the curb, the evidence

7   establishes that the officers had legitimate concerns for their safety, having Azevedo sit on the

8   curb is consistent with appropriate police practices, and the officers had reasonable suspicion that

9   the motorcycle was stolen and that a burglary or trespass was being committed.  Under these

10   circumstances, the detention was reasonable.  Alternatively, qualified immunity is appropriate

11   since a reasonable officer could reasonably conclude that the detention of Azevedo was

12   constitutional.  Summary judgment in favor of Defendants on this issue will be granted.

13   As to Azevedo's arrest, since Azevedo was lawfully detained, the officers had probable

14   cause to arrest Azevedo when he fled from the officers.  Alternatively, a reasonable officer could

15   reasonably conclude under the circumstances that the arrest was constitutional.  Summary

16   judgment in favor of Defendants on this issue will be granted.

17   Defendants also request summary judgment on Azevedo's *Monell* claims.  There are

18   triable issues of material fact regarding the training of officers with respect to taser and

19   uncontrolled falls over a hard surface, and on the policy of requiring officers who use force that

20   results in severe injury to conduct witness interviews.  Summary judgment in favor of the City on

21   these two theories will be denied.  However, Azevedo presented insufficient evidence with

22   respect to the other identified *Monell* theories.  Summary judgment in favor of Defendants on the

23   remaining *Monell* theories will be granted.

24   Finally, Azevedo requests summary judgment on the issue of spoliation sanctions due to

25   the loss of taser data.  Specifically, Azevedo requests an entry of default against Defendants on

26   his excessive force claim and alternatively requests an inference in favor of excessive for

27   combined with preclusion of evidence by the defense of the force that was used.  However, under

28   the circumstances of the case, including the reason for the loss of taser, the other evidence

available, and Azevedo's own testimony, these sanctions are too harsh. Summary judgment will be denied. However, if he chooses to do so, Azevedo may file a motion in limine regarding the propriety of a rebutable spoliation inference instruction.[41]

Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion for summary judgment is GRANTED in part and DENIED in part in that:

        a.    Summary judgment on the issue of standing is DENIED;

        b.    Summary judgment on the issue of curtilage is GRANTED;

        c.    Summary judgment on the issues of detention and arrest is GRANTED;

        d.    Summary judgment on *Monell* liability for inadequate training regarding taser and uncontrolled falls, and improper policy regarding witness interviews, as described above, is DENIED; and

        e.    Summary judgment on all other *Monell* theories, as described above, is GRANTED;

2.    Plaintiff's motion for summary judgment is DENIED; and

3.    Plaintiff may file a motion in limine regarding the propriety of a rebutable inference instruction regarding spoliation.


IT IS SO ORDERED.

**Dated:    June 7, 2010**                          **/s/ Anthony W. Ishii**
                                                    CHIEF UNITED STATES DISTRICT JUDGE

---

[41]The motion in limine schedule will be set in the pre-trial order.