1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT FOR THE

8                      EASTERN DISTRICT OF CALIFORNIA

9

10   LAWRENCE AZEVEDO,                    )        1:09-CV-375  AWI DLB
                                          )
11              Plaintiff,                )        ORDER ON DEFENDANTS'
           v.                             )        SECOND MOTION FOR
12                                        )        SUMMARY JUDGMENT
     CITY OF FRESNO, CITY OF FRESNO       )
13   POLICE DEPARTMENT, OFFICER           )
     KARR, and DOES 1 through 10,         )        (Doc. No. 68)
14   inclusive,                           )
                                          )
15              Defendants.               )
     ─────────────────────────────────── )

16

17

18        This case arises from the detention and arrest of Plaintiff Lawrence Azevedo by Fresno

19   police officer Defendant Nathan Carr ("Carr") while Azevedo was staying at a residence on

20   Weldon Avenue.  Azevedo has brought suit under 42 U.S.C. § 1983 against Carr and the City of

21   Fresno ("the City").  Carr and the City moved for summary judgment on all claims alleged

22   against them, save for Azevedo's excessive force claim.  The Court granted Carr's motion with

23   respect to Azevedo's Fourth Amendment search and detention claims.  The Court also granted

24   summary judgment for the City on various *Monell* claims, with two exceptions.  The Court

25   assumed that Carr used excessive force and found genuine material disputes regarding inadequate

26   training and the investigation of uses of force.

27        At the pre-trial conference, the recent Ninth Circuit opinion of *Bryan v. McPherson*, 608

28   F.3d 614 (9th Cir. 2010), *opinion withdrawn and replaced by*, - - - F.3d - - -, 2010 WL 4925422

1  (9th Cir. Nov. 30, 2010),[1] was discussed.  The Court vacated the trial date and instructed the

2  parties to brief the impact of *Bryan* on Azevedo's excessive force and *Monell* claims.  The Court

3  instructed that this briefing would be treated like a second summary judgment motion to be

4  brought by Defendants.  The Court now has received and considered the additional briefing.  For

5  the reasons that follow, the Court will grant Carr qualified immunity, but deny summary

6  judgment on the *Monell* issue.

7  .

8                              **FACTUAL BACKGROUND**[2]

9        At 2:00 a.m. on November 7, 2007, Carr and his partner Juan Avila ("Avila") were on

10  patrol in a marked police car.  Carr observed an illegally parked motorcycle on the sidewalk in

11  front of a house on Weldon Avenue.  Carr recognized the motorcycle and helmet from a previous

12  encounter in which the rider of the motorcycle successfully evaded Carr's attempt to effectuate a

13  traffic stop.  The registration on the motorcycle was expired, the license plate matched the plate

14  of the motorcycle from the previous encounter, and Carr could find no VIN number.

15        Carr looked up the Weldon house on the patrol vehicle's computer and read that the

16  house may be vacant, with the residents possibly out of town.  There was overgrown vegetation,

17  and the house appeared to be vacant.  The house's front metal security screen door was wide

18  open, the wooden front door appeared significantly damaged with a hole where the doorknob and

19  lock set should have been, newspaper and cloth/curtains covered some of the front windows,

20  other windows had no coverings, and a low light could be seen through the paper over the

21  windows.  The officers were concerned that there was a possible burglary or unlawful trespass,

22  and that the motorcycle may have been stolen. The officers decided to make contact at the

23  location in order to find the owner of the motorcycle and to investigate the house's security.

24

---

25        [1]The new *Bryan* opinion is materially identical to the opinion that was discussed at that pre-trial conference.

26

27        [2]"DUMF" refers to Defendants' undisputed material fact;  "PUMF" refers to Plaintiff's undisputed material
   facts;  PRDUMF refers to Plaintiff's response to Defendants' undisputed material facts.  Additionally, the Court
   examined numerous proposed facts in connection with the first summary judgment motion.  The background facts

28  that do not have a citation are derived from the Court's prior summary judgment order.  See Court's Docket Doc.
   No. 61.  These facts are for background only and are not necessary to the disposition of the current motion.

1   While approaching the front door, the officers noticed locking mechanism pieces, which

2   appeared consistent with both the wood front door and metal screen door, laying on the porch

3   and in the flower bed.  Carr also noticed a glove next to the broken lock which is consistent with

4   someone unlawfully entering a house.

5   Carr knocked on the wood front door, and it immediately swung open since it was not

6   secured.  Carr announced, "Fresno Police."  A large dog then immediately began to growl and

7   bark, and aggressively advanced on Avila.  While Carr was yelling at the dog, Azevedo came

8   outside the threshold of the front door, and Carr told him to get his dog.  Azevedo called his dog,

9   and it stopped in its tracks and turned, then Azevedo heard a gunshot.  Avila fired a shot at the

10  dog in response to the dog's aggression, but missed the dog.  Azevedo then walked down and

11  grabbed his dog.  Carr told Azevedo to put the dog in the house and to close the door.  Azevedo

12  picked up the dog and took it inside the house.

13  The officers asked Azevedo to step outside the gate and ordered him to sit on the curb.

14  Azevedo was being detained while the officers investigated a possible burglary, trespass,

15  squatting, and stolen motorcycle.

16  When Carr and Avila were questioning Azevedo, Azevedo seemed extremely nervous.

17  DUMF 1.  Neither officer told Azevedo to keep his hands visible while he was sitting on the

18  curb.  Azevedo Dec. ¶ 5.[3]  Azevedo was reaching his hand into his waistband where Carr could

19  see a bulge.  DUMF 1.  Avila asked Azevedo if Azevedo had any weapons.  Id.[4]  When asked by

20

---

21      [3]There is a genuine dispute whether the officers told Azevedo to keep his hands visible.  Carr declares that
22  he so stated, but Azevedo declares to the contrary.  Cf. Carr Dec. ¶ 9 with Azevedo Dec. ¶ 5.  For purposes of this
    motion, the Court credits Azevedo's position.  Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).

23      [4]Azevedo disputes this DUMF by arguing that he did not reach for his waistband and Avila did not ask if he
24  had any weapons.  See PRDUMF 1.  Azevedo cites paragraph 4 of his opposition declaration and pages 83, 85, 90,
    and 91 of his deposition.  See id.  Paragraph 4 states in pertinent part, "I don't recall my hands being near my waist
25  area when I was sitting on the curb . . . ."  Azevedo Dec. ¶ 4.  The deposition excerpts contain the following
    testimony:  (1)  "I was - - all I remember is I was told to sit on the curb.  And then I ran after that."  Azevedo Depo.
26  83:14-16, (2) "I don't recall that [i.e. an officer asking if Azevedo had any weapons]."  Id. at 85:5-7, (3) "No" and
    "No.  I don't recall it, but I ran right away too," when asked whether he "remembered" an officer asking him
27  questions and then being asked specifically about weapons.  Id. at 90:19-91:2.  These excerpts have one thing in
    common – they each state that Azevedo does "not remember" or does "not recall."  It is well established that a
28  plaintiff's lack of memory or inability to recall an event or a conversation, without more, does not create a genuine
    material dispute.  Wysong v. City of Heath, 260 Fed.Appx. 848, 856 (6th Cir. 2008); FEC v. Toledano, 317 F.3d
    939, 950 (9th Cir. 2002) ("But failure to remember and lack of knowledge are not sufficient to create a genuine

Avila if he had any weapons on him, Azevedo suddenly jumped up and ran.  See DUMF 2.
Azevedo ran almost immediately after he sat down on the curb.  PUMF 28.

As Azevedo was running from the officers, Carr told Azevedo to stop.  See Schaaf Depo.
at 9:23-25; Molina Depo. 26:14-16; Carr Dec. ¶ 11.[5]  Azevedo was focused on trying to run, and
he continued to run after being told to stop.  See Carr Dec. ¶ 11; Avila Dec. ¶ 8; PRDUMF 3.
Azevedo has no recollection of Carr yelling "stop" since he was focused on running.  See DUMF
4; Azevedo Depo. 91:11-25.

Carr was concerned because it was clear to him that, even after being given repeated
commands to stop, Azevedo was not going to stop.  DUMF 7.  Carr had on his full gear and was
tired from trying to keep up with Azevedo.  Id.[6]  Also, Carr believed that Azevedo had fled from
him on a prior occasion.  Id.  Carr was concerned for his safety and believed that he would be at a
disadvantage if he had to fight with Azevedo and thus, Carr opted to use the Taser.  See id.
Azevedo was struck with the Taser darts in the upper and middle back, and he immediately fell
forward.  DUMF 8.[7]

---

dispute."); FDIC v. National Union Fire Ins. Co., 205 F.3d 66, 75 (2d Cir. 2000); Dickey v. Baptist Mem'l Hosp.,
146 F.3d 262, 266 n.1 (5th Cir. 1998); Ace Rent-A-Car, Inc. v. Empire Fire & Marine Ins. Co., 580 F.Supp.2d 678,
689 n.5 (N.D. Ill. 2008).  Because Azevedo's lack of memory does not create a genuine dispute, the cited portions of
DUMF 1 are undisputed.  See id.

[5]Carr contends that he told Azevedo to stop or else Carr would use his taser.  See DUMF 3.  However,
Azevedo contends that Carr never warned him that a taser would be used.  See PRDUMF 3.  Azevedo cites
deposition testimony from witnesses who heard or saw the confrontation from their homes.  While some witnesses
heard someone yell "stop," none of the witnesses heard anything about a taser.  Viewing the evidence in the light
most favorable to Azevedo as the non-moving party, the Court believes that there is a genuine conflict created
between the officer's testimony and the witnesses' testimony.  For purposes of this motion, the Court credits
Azevedo's position.  See Stegall, 350 F.3d at 1065.

[6]Azevedo disputes this aspect of DUMF 7 by arguing that Carr was not tired, was catching up to Azevedo,
and had caught up to Azevedo.  Azevedo relies on the deposition testimony of Ramone Ramirez for this argument.
See PRDUMF 7.  However, the cited portions of Ramirez's deposition simply indicate that Carr was catching up and
was between 3 and 4 feet away from Azevedo when Azevedo went down.  See Ramirez Depo. 27:3-28:22.  Ramirez
said nothing about Carr not being tired.  In fact, Ramirez testified that it took the officers "a while to catch
[Azevedo]."  Id. at 27:7-8.  DUMF 7 is undisputed.

[7]Azevedo states that he does not deny this DUMF for purposes of this motion only.  Azevedo lists other
theories relating to excessive force.  The Court will not treat Azevedo's response to this DUMF as a judicial
admission that limits his theories.  This motion is meant to address Carr's liability under a theory that Carr used a
taser on Azevedo while Azevedo was running on the road, and that the fall on the road from the taser caused
Azevedo significant physical damage.

1    Carr deployed the taser while running after Azevedo at full speed and over concrete.  See

2    PUMF 32.  Carr had been gaining on Azevedo and got within 3 to 4 feet of him.  See PUMF 36.[8]

3    Azevedo was neither assaultive nor combative before Carr used the taser.  PUMF 33.  Carr never

4    saw anything that looked like a weapon in Azevedo's possession prior to using the taser.  See

5    PUMF 34.  Azevedo was not reaching into his waistband.  PUMF 35.[9]  The officers did not tell

6    Azevedo that he was under arrest before Carr deployed the taser.  See PUMF 39.  Carr had no

7    information that Azevedo had committed any felonies that night.  See PUMF 17.  Azevedo does

8    not deny that he was tased, but claims that he put his arms out and broke his fall, i.e. "from

9    hitting directly full face," Azevedo Depo. 92:17-21, after which he was lifted up by his belt and

10   dropped and then everything went black.  DUMF 9.

11       After taking Azevedo into custody, the officers found a small black zipper bag protruding

12   from Azevedo's right front pants pocket.  See DUMF 10.  The black zipper bag contained

13   hypodermic syringes, a metal spoon, and a medicine vial with methamphetamine.  See id.  Prior

14   to taking Azevedo into custody, Carr had no information that Azevedo had committed any

15   felonies.  See PUMF 17.  Azevedo suffered multiple facial fractures/injuries that required

16   hospitalization and surgery.  See PUMF's 42-45.  No criminal charges were ever filed against

17   Azevedo arising out of the incident.  PUMF 46.

18

19                    **SUMMARY JUDGMENT STANDARD**

20       Summary judgment is appropriate when it is demonstrated that there exists no genuine

21   issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

22   Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

23   American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

24   _____

25       [8]There is a dispute regarding how far away Carr was from Azevedo when Carr deployed the taser.  Carr
     estimated between 12 and 15 feet, but Ramone Ramirez guessed 3 to 4 feet.  Cf. Carr Depo. 77:5-78:2 with Ramirez
26   Depo. 27:3-28:22.  For purposes of this motion, the Court credits Azevedo's position.  See Stegall, 350 F.3d at 1065.

27       [9]There is a genuine dispute whether Azevedo was reaching into his waistband just prior to Carr using his
     taser.  Carr testified that Azevedo so reached, Azevedo testified to the contrary.  Cf. Carr Depo. 76:24-77:16 with
28   Azevedo Depo. 88:13-16.   For purposes of this motion, the Court must credit Azevedo's version.  See Stegall, 350
     F.3d at 1065.

                                    5

1  judgment bears the initial burden of informing the court of the basis for its motion and of

2  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

3  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

4  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

5  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

6  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

7  Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

8  sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

9  477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

10      Where the moving party will have the burden of proof on an issue at trial, the movant

11  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

12  movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

13  proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

14  element of the non-moving party's claim or by merely pointing out that there is an absence of

15  evidence to support an essential element of the non-moving party's claim.  See James River Ins.

16  Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

17  & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

18  to carry its burden of production, then "the non-moving party has no obligation to produce

19  anything, even if the non-moving party would have the ultimate burden of persuasion."  Nissan

20  Fire, 210 F.3d at 1102-03.  If the moving party meets its initial burden, the burden then shifts to

21  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

22  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210

23  F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its]

24  pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a

25  genuine issue for trial.'"  Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir.

26  2008) (quoting Fed. R. Civ. Pro. 56(e)).

27      The evidence of the opposing party is to be believed, and all reasonable inferences that

28  may be drawn from the facts placed before the court must be drawn in favor of the opposing

party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad,

Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

and it is the opposing party's obligation to produce a factual predicate from which the inference

may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008);

UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

material fact does not spring into being simply because a litigant claims that one exists or

promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d

15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

"motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

'is not significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

circumstances to consider materials that are not properly brought to its attention, but the court is

not required to examine the entire file for evidence establishing a genuine issue of material fact

where the evidence is not set forth in the opposing papers with adequate references.  See

Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

to produce evidence sufficient to create a genuine issue of material fact, the moving party is

entitled to summary judgment.  See Nissan Fire, 210 F.3d at 1103.

**I.      OFFICER CARR**

*Defendant's Argument*

Carr argues that use of the taser was reasonable under the circumstances.  First, Azevedo

was violating Penal Code § 148, and the officers were investigating several crimes (stolen

motorcycle, residential burglary, and trespass).  Although these crimes may not be considered

individually serious, together they were significant.  Second, there were a number of factors that

potentially threatened the officers' safety.  Specifically: (1) the driver of the motorcycle

previously fled from Carr, and Carr believed that the driver was Azevedo; (2) the officers had

7

just been threatened by Azevedo's dog; (3) Azevedo had not been checked for weapons (4) Azevedo fled when he was asked about weapons; (5) Azevedo had reached towards his waistband prior to running; (6) Azevedo refused to stop despite commands; and (7) Carr had on his full gear and was tiring from the chase.  Finally, Azevedo was attempting to evade arrest by flight.  These considerations show reasonableness.  Azevedo was subject to arrest, but he fled which indicated that he was not going to be taken into custody without a fight.  If Carr had not used the taser, he would have been forced to physically engage a subject who was going to resist and who had not been searched for weapons.  Tasers are used to defuse dangerous situations from a distance without the need for more severe force.  That is what happened in the situation that Azevedo himself created.

Alternatively, Carr argues that he is entitled to qualified immunity.  As of November 2007, case law indicated that tasers were generally considered non-lethal and were commonly used to subdue resisting individuals.  Carr used the taser while Azevedo was fleeing.  There are no cases prior to November 2007 that held that use of a taser on a fleeing suspect would violate a suspects rights.  Further, the Ninth Circuit has held that the law regarding tasers in the summer of 2005 was not clearly established.  In *Bryan v. McPherson*, in the course of a traffic stop, Bryan exited his vehicle yelling gibberish and hitting his thighs.  Bryan was standing 20 to 25 feet away from officers, did not verbally threaten the officers, and was not attempting to flee.  Without warning, McPherson deployed his taser, and Bryan fell face first on the concrete surface.  Bryan suffered four fractured teeth and facial contusions.  In that case, although the Ninth Circuit found a Fourth Amendment violation, they gave McPherson qualified immunity because the law on tasers was not clearly established.  Here, unlike *Bryan*, the officers were dealing with more than a traffic infraction, the officers had concern for their safety, Bryan was fleeing, and Carr was tiring from the chase.  Given the facts of *Bryan* in which immunity was granted, and the facts of this case, the law was not clearly established.

*Plaintiff's Opposition*

Azevedo argues that the taser is a significant amount of force that represents a greater intrusion than other non-lethal alternatives.  The use of the taser was not justified in this case.

8

1   Azevedo argues that he posed no immediate threat to the safety of others in that he was unarmed,

2   was not aggressive, was not combative, and had been compliant prior to running away.  Further,

3   Carr had no information that Azevedo had committed a felony or a violent infraction.  At most,

4   Carr only had probable cause for the misdemeanor offense of resisting or obstructing an officer.

5   Although Azevedo was attempting to evade detention, he argues that there was no need to use the

6   taser to prevent flight.  Roger Clark has declared that other reasonable alternatives were available

7   to Carr.  Azevedo was outnumbered by the officers.  Because Carr was gaining on Azevedo, Carr

8   could have reached out and used a "firm grip" on Azevedo to stop his flight.  The officers also

9   should have attempted to use verbal skills to coerce compliance, yet Carr did not warn Azevedo

10  that the taser would be used.  Further, it should have been clear that use of the taser would cause

11  an uncontrollable fall on a hard surface.

12         Azevedo also argues that qualified immunity is not appropriate because, prior to

13  November 7, 2007, "it was clear to a reasonable officer that deploying a Taser in dart mode on a

14  non-combative, unarmed person who was running full-speed over concrete and with whom the

15  officer had caught up to within range of a "firm grip" – all while without having probable cause

16  that the person had committed a felony – was excessive force."  Analogous cases from the

17  Western District of Washington (in June 2007), the Eastern District of California (in November

18  2006), and the Central District of California (in August 2006) were sufficient to put Carr on

19  notice that his conduct was unconstitutional.  With respect to *Bryan*, the facts of this case are

20  different because deploying a taser on a non-moving target (as in *Bryan*) is markedly different

21  from deploying the taser on a person who is running full speed on concrete.  The result of falling

22  while standing still is different from falling while running.

23         *Legal Standards*

24         1.     Fourth Amendment – Excessive Force

25         All claims that law enforcement officers used excessive force, either deadly or non-

26  deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be

27  analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Graham

28  v. Connor, 490 U.S. 386, 395 (1989); Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th

1   Cir. 2003).   The pertinent question in an excessive force case is whether the use of force was

2   "objectively reasonable in light of the facts and circumstances confronting [the officers], without

3   regard to their underlying intent or motivation."   Graham, 490 U.S. at 397; Blankenhorn v. City

4   of Orange, 485 F.3d 463, 477 (9th Cir. 2007).   The analysis of whether a specific use of force

5   was reasonable "requires a careful balancing of the nature and quality of the intrusion on the

6   individual's Fourth Amendment interests against the countervailing government interests at

7   stake."   Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis v. City of Las Vegas, 478

8   F.3d 1048, 1054 (9th Cir. 2007).   "We first assess the quantum of force used to arrest [the

9   plaintiff]" and then "measure the governmental interests at stake by evaluating a range of

10   factors."   Davis, 478 F.3d at 1054.   Factors that are considered in assessing the government

11   interests at stake include, but are not limited to, "the severity of the crime at issue, whether the

12   suspect poses an immediate threat to the safety of the officers or others, and whether he is

13   actively resisting arrest or attempting to evade arrest by flight."   Graham, 490 U.S. at 396;

14   Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054.   Further, where it is or should be

15   apparent that an individual is emotionally or mentally unstable, that is a factor that must be

16   considered in determining the reasonableness of the force employed.   See Drummond, 343 F.3d

17   at 1058.   "In some cases . . ., the availability of alternative methods of capturing or subduing a

18   suspect may be a factor to consider."   Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005).

19   However, police officers "are not required to use the least intrusive degree of force possible" as

20   long as the force actually used was reasonable.   Forrester v. City of San Diego, 25 F.3d 804, 807

21   (9th Cir. 1994); see Luchtel v. Hagemann, 623 F.3d 975, 982 (9th Cir. 2010).   Further, courts

22   may consider whether a specific warning was given, where giving a warning was feasible under

23   the circumstances.   See Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001).

24   Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather

25   than with the 20/20 vision of hindsight."   Graham, 490 U.S. at 396; Drummond, 343 F.3d at

26   1058.   "The calculus of reasonableness must embody allowance for the fact that police officers

27   are often forced to make split-second judgments – in circumstances that are tense, uncertain, and

28   rapidly evolving – about the amount of force that is necessary in a particular situation."   Graham,

490 U.S. at 396-97; Drummond, 343 F.3d at 1058.  Since "[n]ot every push or shove, even if it

may seem unnecessary in the peace of the judge's chambers, . . . violates the Fourth

Amendment," Graham, 490 U.S. at 396, "[n]either tackling nor punching a suspect to make an

arrest necessarily constitutes excessive force."  Blankenhorn, 485 F.3d at 477.   "Force is

excessive when it is greater than is reasonable under the circumstances."  Santos v. Gates, 287

F.3d 846, 854 (9th Cir. 2002).  When the circumstances show that there is no need for force, any

force used is constitutionally unreasonable.  See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir.

2001); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

### Qualified Immunity

Qualified immunity protects "government officials . . . from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982);

Phillips v. Hust, 477 F.3d 1070, 1079 (9th Cir. 2007); Brittain v. Hansen, 451 F.3d 982, 987 (9th

Cir. 2006).  The "concern of the immunity inquiry is to acknowledge that reasonable mistakes

can be made," and that it is "often difficult for an officer to determine how the relevant legal

doctrine will apply to the factual situation that he faces."  Estate of Ford v. Ramirez-Palmer, 301

F.3d 1043, 1049 (9th Cir. 2002).

A court employs a tiered analysis for determining qualified immunity.  See Saucier v.

Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th

Cir. 2006); Brittain, 451 F.3d at 987.   However, lower courts need not strictly follow the tiered

sequence in analyzing qualified immunity, but instead may dispose of the issue at step two

without addressing step one.  Pearson v. Callahan, 129 S.Ct. 808, 821 (2009); Moss v. United

States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009).  Under the first step, the court

determines whether, "taken in the light most favorable to the party asserting the injury, do the

facts show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at 201;

Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229.  If the answer is "no," then the inquiry ends

and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis.  See

Saucier, 533 U.S. at 201; Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007);

1   Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003).

2        Under the second step, the court determines "whether the right was clearly established,"

3   and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th

4   Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988.  The critical question is

5   whether "the contours of the right were sufficiently clear that a reasonable official would

6   understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d

7   at 1079.  Whether a right is clearly established must be "undertaken in light of the specific

8   context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Skoog, 469

9   F.3d at 1229-30.  In making this determination, the court considers the state of the law at the time

10  of the alleged violation, but it is unnecessary for the precise conduct in question to have been

11  previously held unlawful.  See Inouye, 504 F.3d at 712; Devereaux v. Perez, 218 F.3d 1045,

12  1052 (9th Cir. 2000).  Further, the court considers the "information possessed" by the officer at

13  the time of his conduct.  See Hunter v. Bryant, 502 U.S. 224, 227 (1991); Anderson v. Creighton,

14  483 U.S. 635, 641 (1987); Edgerly v. City & County of San Francisco, 495 F.3d 645, 654 (9th

15  Cir. 2007).  If the officer could have reasonably, but mistakenly, believed that his conduct did not

16  violate a clearly established constitutional right, then the officer will receive qualified immunity.

17  See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v.

18  City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).  As a wholly objective inquiry, see

19  Brittain, 451 F.3d at 988, the "'subjective beliefs' of the actual officer are . . .irrelevant." Inouye,

20  504 F.3d at 712; see Anderson, 483 U.S. at 641.  Thus, qualified immunity applies "if 'a

21  reasonable officer could have believed [the action] to be lawful, in light of clearly established law

22  and the information the . . . officer[] possessed.'" Lawrence v. United States, 340 F.3d 952, 956-

23  957 (9th Cir. 2003); see also Hunter, 502 U.S. at 227.  Whether the law was "clearly established"

24  and whether an officer could have a reasonable, albeit mistaken, belief that his conduct was

25  lawful are questions of law for the court to decide on summary judgment when the pertinent

26  material facts are undisputed.  See Franklin v. Fox, 312 F.3d 423, 437 (9th Cir. 2002); LaLonde

27  v. County of Riverside, 204 F.3d 947, 953-954 (9th Cir. 2000); Neely v. Feinstein, 50 F.3d 1502,

28  1509 (9th Cir. 1995); Act Up!/Portland v. Bagley, 988 F.2d 868, 873 (9th Cir. 1993).

1    *Discussion*

2        1.    Excessive Force

3        As indicated above, the Court must examine not only certain enumerated considerations,

4    but also any other pertinent consideration that is part of the totality of the circumstances.

5        First, the force at issue is a taser application in "dart mode."[10]  The Ninth Circuit has

6    quantified this type of force.  The use of a taser in dart mode is an "intermediate or medium,

7    though not insignificant, quantum of force."  Bryan, 2010 WL 4925422 at *16.

8        Second, the crimes potentially at issue were misdemeanor offenses, they were not

9    felonies.[11]    See PUMF 17.  Carr had probable cause to arrest Azevedo for obstruction under

10   Penal Code § 148.  The officers also were legitimately investigating the possibility of a stolen

11   motorcycle, trespass, and burglary.  Based on the lock set and glove found in the flower bed by

12   the porch, the evidence of burglary was particularly compelling.  Misdemeanors are regarded as

13   less serious offenses, and the government interest concerning misdemeanors is less than that

14   concerning felonies.  See Bryan, 2010 WL 4925422 at *19.  However, the Court finds some

15   merit to Carr's contention that the number of misdemeanor offenses involved increased the

16   government's interest in apprehending Azevedo.  Generally speaking, the more offenses that a

17   person commits, the greater the danger to, and the disruption of, society.  Nevertheless, the Ninth

18   Circuit has found that misdemeanors, even multiple misdemeanors, that are not "inherently

19   dangerous or violent" do not justify a significant uses of force.  See id. at *19 & n.12.  While the

20   Court will take into account that multiple crimes were potentially at issue, the fact remains that

21   the crimes were misdemeanors and they do not appear to be inherently dangerous or violent.[12]

22

23       [10]The Taser uses "compressed nitrogen to propel a pair of 'probes'— aluminum darts tipped with stainless
24   steel barbs connected to the X26 by insulated wires—toward the target at a rate of over 160 feet per second. Upon
     striking a person, the X26 delivers a 1200 volt, low ampere electrical charge through the wires and probes and into
25   his muscles. The impact is as powerful as it is swift. The electrical impulse instantly overrides the victim's central
     nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless."  Bryan v.
26   McPherson, - - - F.3d - - -, 2010 WL 4925422, *15 (9th Cir. 2010).

27       [11]The evidence suggested only a misdemeanor burglary because it appeared that the Weldon House was not
     currently inhabited.  See Cal. Pen. Code §§ 459, 460(a), (b), 461(b).

28       [12]If the evidence had not suggested that the residence was vacated/uninhabited, a different conclusion would
     have been reached since burglary of a home is a serious offense.  Tennessee v. Garner, 471 U.S. 1, 22 (1985).

1  The crimes at issue are in the lower end of the spectrum and can not, by themselves, justify the

2  use of significant force.  See id.

3       Third, at the time Carr deployed his taser, it did not appear that Azevedo posed an

4  immediate threat to the safety of Carr or to third persons.  No weapons were visible on Azevedo,

5  the crimes involved were not violent, Azevedo had not assaulted the officers, and Azevedo was

6  moving in the opposite direction of the officers.  It is true that Azevedo had reached towards or

7  around his waistband while he was sitting on the curb, and that he ran when asked whether he

8  had weapons on him.  However, Azevedo was not reaching towards his waistband while he was

9  running, and at no time did he either display or use a weapon around the officers.  There is

10  insufficient evidence that Azevedo posed a current threat to safety at the time he was tasered.[13]

11       Fourth, although Azevedo was not physically resisting arrest, he was actively fleeing.

12  Azevedo fled before the officers could meaningfully ask him questions about his presence in the

13  house and about the motorcycle.  Azevedo fled shortly after being told to sit at the curb and just

14  after he was asked about weapons.  Azevedo was told to stop, but refused to do so.  Carr

15  deployed his taser while he and Azevedo were running at full speed, that is, while Azevedo was

16  actively evading arrest.  The active evasion or flight by a non-felon generally favors a police

17  officer's use of non-deadly force.  See Miller v. Clark County, 340 F.3d 959, 965-66 (9th Cir.

18  2003).

19       Fifth, there was no indication that Azevedo was mentally ill or mentally unstable.  As

20  such, this is a neutral consideration.  Cf. Drummond, 343 F.3d at 1058.

21       Sixth, Carr gave no warning about the taser.[14]  Carr did yell at Azevedo to "stop," but no

22  specific warning about the taser was given, and there is no indication that a warning would have

23  been impractical.  See Deorle, 272 F.3d at 1284.

24       Seventh, Azevedo's police procedure's expert has opined that an alternate technique was

25  available to Carr other than the taser.  Roger Clark has opined that Carr could have used a

26

27       [13]The Court again notes that there is a genuine material dispute whether Azevedo was reaching for his
28  waistband just prior to Carr deploying his taser.

       [14]Again, the Court notes that there is a genuine dispute whether Carr gave a warning about using the taser.

combination of a "firm grip" and verbal commands.  <u>See</u> Clark Qualified Immunity Dec. ¶ 5.
The firm grip technique appears to be simply a matter of reaching out and firmly grabbing hold
of a suspect.  <u>See</u> <u>id.</u>; <u>see also</u> Clark Depo. at 19.  Clark opines that this technique would have
ended the chase, especially since two fully equipped officers were on scene.[15]  <u>See</u> Clark
Qualified Immunity Dec. ¶ 5.

Eighth, when Carr deployed the taser, he was running at full speed, was in full gear, and
was tiring.  <u>See</u> DUMF 7.  By his uncontradicted declaration, Carr was tiring to the point were he
believed that he would be at a disadvantage if a physical confrontation occurred.  <u>See</u> <u>id.</u>

Finally, Azevedo was running at full speed on the street at the time he tasered.  That is,
Azevedo was on a hard surface.  The risk of injury from an uncontrolled fall on a hard surface is
something that a police officer trained in the use of a taser should foresee.  <u>See</u> <u>Bryan</u>, 2010 WL
4925422 at *15.  It is evident that the risk and nature of a falling injury would be exacerbated  by
the speed at which the suspect is moving.  <u>Cf.</u> <u>id.</u> (stating that, where a stationary subject lost
muscle control and fell face forward from taser application, a reasonable officer trained regarding
tasers "would have foreseen these physical injuries when confronting a shirtless individual
standing on asphalt.").  The Court must consider the speed of Azevedo, as well as the hard
surface over which he ran.  <u>See</u> <u>id.</u>

In light of the above factors, and viewing the evidence in the light most favorable to
Azevedo, the Court concludes that the evidence supports more than one reasonable inference and
that a reasonable jury could find a Fourth Amendment violation.  The key considerations that
could lead a reasonable jury to find a Fourth Amendment violation are:  the crimes involved, the
lack of an immediate threat to the officers or third persons, and the nature of the force involved
as amplified by the fact that Azevedo was running over a hard surface.[16]  As noted above, the use

---

[15]The Court again notes that there is a genuine material dispute regarding the distance between Carr and
Azevedo when Carr deployed the taser.

[16]It is unclear at this point whether warning about the taser would have been effective given Azevedo's
testimony that he did not recall hearing Carr say "stop" and was only focused on running.  <u>See</u> Azevedo Depo.
91:11-25.  Also, without further elaboration, the efficacy of the "firm grip" technique seems questionable.  If both
Carr and Azevedo were running at full speed, there would appear to be a danger that Carr's use of the "firm grip"
would lead to both Carr and Azevedo tumbling onto the concrete.

1  of a taser in dart mode is an intermediate and significant quantum of force.  Given the nature of

2  the use of force, something more than nonviolent misdemeanors must be at play to justify its use.

3  While Azevedo was clearly in flight when Carr deployed the taser, the Court cannot say as a

4  matter of law that Azevedo's flight made use of the taser reasonable.  The misdemeanors

5  involved were all non-violent, and the evidence indicates that Azevedo did not pose an

6  immediate threat to the officers.  Importantly, Azevedo and Carr were running at full speed on

7  the street.  It was understood that the taser would immobilize Azevedo.  It should have also been

8  understood that uncontrolled falls are an inherent risk associated with tasers.  The potential for

9  injury from an uncontrolled fall is increased if a full speed foot race over concrete is occurring.

10  In the absence of an immediate threat posed by Azevedo, a reasonable jury could conclude that

11  the nature of the force and the risk of injury were too great relative to the offenses at issue.  See

12  Bryan, 2010 WL 4925422 at *22.  Summary judgment on the issue of whether Carr violated

13  Azevedo's Fourth Amendment rights will be denied.  Cf. Holly D. v. California Inst. of Tech.,

14  339 F.3d 1158, 1175 (9th Cir. 2003) (summary judgment improper where reasonable conflicting

15  inferences are possible from the facts).

16                    2.    Qualified Immunity

17        Having found that Azevedo's version of the facts prohibits summary judgment on

18  whether the Fourth Amendment was violated, the Court will proceed to determine whether Carr

19  is entitled to qualified immunity.  The use of force at issue occurred on November 7, 2007.  After

20  reviewing the cases cited by the parties, the Court concludes that, as of November 7, 2007, the

21  law was not so clearly established that a reasonable officer in Carr's position would know that

22  use of the taser on Azevedo was unconstitutional.

23        The Ninth Circuit and this Court have previously concluded that, under the facts of the

24  respective cases, the law as it relates to taser use and excessive force was not clearly established

25  as of August 19, 2004 and July 24, 2005.  See Bryan, 2010 WL 4925422 at *23 (discussing

26  2005); Sanders, 551 F.Supp.2d at 1171-72 (discussing 2004).  In arguing that the law was clearly

27  established as of November 7, 2007, Azevedo cites or relies on four cases:  LeBlanc v. City of

28  Los Angeles, 2006 U.S. Dist. LEXIS 96768 (C.D. Cal. Aug. 19, 2006), Rios v. City of Fresno,

1 | 2006 U.S. Dist. LEXIS 85642 (E.D. Cal. Nov. 14, 2006), *Bates v. King County*, 2007 U.S. Dist.

2 | LEXIS 47047 (W.D. Wash. June 27, 2007), and *Estate of Bojcic v. City of San Jose*, 2007 U.S.

3 | Dist. LEXIS 75496 (N.D. Cal. Sept. 26, 2007).   Additionally, Azevedo argues that *Bryan* does

4 | not support qualified immunity for Carr.

5 |       The Court is not convinced by Azevedo's arguments.  The key facts in this case are the

6 | multiple crimes (albeit misdemeanors) involved, the fact that Azevedo had reached towards his

7 | waistband while seated and began running after being asked about weapons, that Azevedo was in

8 | active flight, that Azevedo refused to stop despite a command, and that Carr was tiring and

9 | concerned that he would be at a disadvantage in a physical altercation.  In none of Azevedo's

10 | unpublished cases are the facts sufficiently similar to the facts in this case.

11 |       In *LeBlanc v. City of Los Angeles*, LeBlanc was acting paranoid and delusional and was

12 | chasing cars by foot in the middle of the road.  See LeBlanc, 2006 U.S. Dist. LEXIS 96768 at *2-

13 | *3.  To prevent LeBlanc from wandering into the road, a private security guard handcuffed

14 | LeBlanc to a chain-link fence along the sidewalk.  See id. at *4-*5.  Police officers eventually

15 | arrived, but LeBlanc continued to speak incoherently and tried to grab or hit the officers

16 | whenever they approached.  See id. at *5-*7.  It appeared that LeBlanc was either mentally ill or

17 | under the influence of a drug like PCP.  See id. at *4-*6.  The officers deployed a taser, swarmed

18 | LeBlanc, fired a second taser cycle, and placed restraints on him.  See id. at *10-*11.  LeBlanc

19 | stopped breathing and died shortly thereafter.  See id. at *12.  Summary judgment was denied

20 | because *inter alia* expert testimony indicated that the taser could potentially be considered lethal

21 | force given LeBlanc's behavior and appearance, and because LeBlanc was chained to the fence

22 | and posed no risk to the officers.  See id. at *38, *40-*41.  However, because the law concerning

23 | tasers was not clearly established, qualified immunity was granted.  See id. at *51.

24 |       The facts of *LeBlanc* are materially different from the case at bar.  There is no contention

25 | that Azevedo displayed disturbed behavior that might make the use of a taser improper.  Further,

26 | unlike Azevedo, LeBlanc was not actively fleeing and had not begun his flight after being asked

27 | about weapons.  LeBlanc was stationary because he was handcuffed to a fence.

28 |       In *Rios v. City of Fresno*, Rios was a bus driver who was pulled over by two police

1    officers.  See Rios, 2006 U.S. Dist. LEXIS 85642 at *12-*13.   The officers spoke with Rios,

2    moved him away from the bus towards the patrol car, asked him to sit on a nearby curb when

3    they perceived that Rios appeared to be tensing, but Rios refused to sit on the curb.  See id. at

4    *15-*16.  When told that he would be arrested if he did not cooperate, Rios said "go for it."  See

5    id. at *17.  The officers attempted to handcuff Rios.  See id. at *17.  Rios pulled his arms up to

6    avoid being handcuffed, and one of the officers deployed his taser.  See id. at *18.  Summary

7    judgment was denied because there were material disputed facts regarding the level of Rios's

8    resistance and cooperation.  See id. at *32.  Qualified immunity was denied because a reasonable

9    jury could have believed Rios's version of events, which would have mandated that no force be

10   used.  See id. at *59-*60.

11        The facts of *Rios* are materially different from the case at bar.  In the case at bar, no party

12   has argued that Carr should have utilized no force or that Azevedo was completely cooperative.

13   Further, unlike Azevedo, Rios was not actively fleeing after having just been asked about

14   weapons.

15        In *Bates v. Kings County*, Bates, his brother, and two friends were walking home from a

16   bar when they were stopped by a deputy sheriff.  See Bates, 2007 U.S. Dist. LEXIS 47047 at *3.

17   The deputy collected the individuals' identification, informed the men that he would ticket them,

18   and said that they could obtain their identifications and citations the next morning at a substation.

19   See id. at *4.  Bates and his brother tried to leave, the deputy approached the brothers, and a

20   backup deputy arrived.  See id. at *5.  The first deputy began to place Bates under arrest.  See id.

21   Bates struggled and saw the other deputy hit his brother.  See id. at *6.  Bates broke free and ran

22   towards his brother.  See id.  The second deputy then deployed his taser on Bates and then kicked

23   Bates three times in the face, breaking Bates's jaw.  See id.  Summary judgment was denied

24   because there were disputed material facts regarding the parties' behavior prior to the taser,

25   including after Bates broke free from the first deputy.  See id. at *24-25.  Qualified immunity

26   was denied on the basis of the same material disputed facts.  See id. at *28.

27        The facts in *Bates* are materially different than the case at bar.  In the case at bar, unlike

28   *Bates*, there are no "widely varying" versions of events leading up to the tasering.  See id. at *24-

1   *25, *28.  Most importantly, unlike *Bates*, there is no dispute that Azevedo was actively fleeing

2   after he was asked about weapons.

3        Finally, in *Estate of Bojcic v. City of San Jose*, the manager of a Starbuck's requested that

4   a police officer (who was also at the Starbuck's) approach Bojcic about smoking a cigarette and

5   getting him to leave the premises.  See Estate of Bojcic, 2007 U.S. Dist. LEXIS75406 at *4-*5.

6   The officer approached Bojcic, Bojcic extinguished the cigarette at the officer's request, the

7   officer requested that Bojcic stand, but Bojcic pointed to his foot and said his foot hurt.  See id. at

8   *6.  The officer then placed his hands on Bojcic to get him to stand, which caused Bojcic to jump

9   up and hold a chair in a defensive posture.  See id.  The officer deployed his taser, but the taser

10  did not disable Bojcic.  See id. at *7.  Bojcic then attacked the officer, and the officer shot and

11  killed Bojcic.  See id.  Summary judgment on use of the taser was denied because the evidence

12  indicated that the Bojcic was in a purely defensive posture and not threatening anyone.  See id. at

13  *19.  The court explained, if "the trier of fact concludes from the testimony that Bojcic was not

14  threatening anyone, *not fleeing*, and that no other circumstances made it crucial to subdue him as

15  quickly as possible, it seems at least possible the trier of fact could also conclude that use of a

16  taser was unreasonable."  Id.  Qualified immunity was denied at that time, but the court stated

17  that the possibility remained that it would conclude at trial that qualified immunity was

18  appropriate.  See id. at *21 & n.4.

19        The facts of *Bojcic* are materially different from the facts of the case at bar.  The *Bojcic*

20  court itself emphasized that Bojcic was not fleeing, unlike Azevedo.  Further, unlike the case at

21  bar, there was no legitimate crime under investigation when the officer confronted Bojcic.  See

22  id. at *16-*17.

23        Carr has cited one case, and the Court has found one case, that involve a suspect who was

24  fleeing at the time a taser was deployed and that occurred prior to November 2007:  *Beaver v.*

25  *City of Federal Way*, 507 F.3d 1137 (W.D. Wash. 2006) and *Tillman v. Kight*, 2006 U.S. Dist.

26  LEXIS 95591 (S.D. Ga. November 29, 2006).

27        In *Beaver*, an officer was dispatched to investigate a residential burglary in which Beaver

28

19

1   was the suspect.[17]  See Beaver, 507 F.Supp.2d at 1140.  At the scene, the officer saw Beaver

2   running.  See id.  The officer ordered Beaver, who appeared to be under the influence of a

3   narcotic, to stop running, but Beaver did not do so and did not appear to comprehend.  See id.

4   When Beaver failed to halt, the officer deployed his taser in dart mode.  See id.  The first taser

5   application caused Beaver's muscles to contract and Beaver fell to the ground.  See id. at 1141.

6   Several other taser applications were subsequently used against Beaver and another officer

7   arrived.  See id.  At the time of the first taser application, Beaver did not appear to be armed and

8   was not an immediate threat to the officer or others.  See id. at 1144.  While the district court

9   found that some of the subsequent taser applications were unreasonable, see id. at 1146, the court

10  concluded that "Beaver was attempting to flee and the Court has no trouble concluding that the

11  first tasing was justified to stop him."  Id. at 1144.

12          In Tillman, officers chased Tillman on suspicion of a misdemeanor sale of a controlled

13  substance.  See Tillman, 2006 U.S. Dist. LEXIS 95591 at *2.  Without warning, an officer shot

14  Tillman in the back with a taser and repeatedly pulled the trigger.  See id. at *3.  The taser was

15  deployed as Tillman fled.  See id.  The taser caused Tillman to seize and then caused Tillman

16  physical injury as he collapsed to the ground.  See id. at *4.  There were no indications that

17  Tillman had committed a dangerous felony, that he was armed, or that he threatened anyone.  See

18  id. at *3-*4.  After reviewing case law, the district court held that "a single shock from a taser is

19  constitutionally permissible to seize a fleeing suspect."  Id. at *14.[18]

20          The Court cannot hold that Beaver and Tillman constitute "clearly established law" for

21  purposes of qualified immunity.  Nevertheless, these cases are similar to the case at bar on the

22  key fact of active flight.  Beaver and Tillman suggest that a single taser application to stop a

23  fleeing suspect is constitutionally permissible.

24          With respect to the Bryan decision, the facts of that case, while different from the case at

25  bar, are still instructive.  In Bryan v. MacPherson, Bryan received a speeding ticket on his way

26

27          [17]Unlike the case at bar, the burglary at issue in Beaver was a felony.  See Beaver, F.Supp.2d at 1144.

28          [18]The Tillman court continued its analysis of the additional taser applications and found that they
constituted excessive force.  See Tillman, 2006 U.S. Dist. LEXIS 95591 at *150*16.

down to Coronado, California in the early morning hours of July 24, 2005. See Bryan, 2010 WL

4925422 at *13.  Bryan was clad in a t-shirt, boxer shorts, and tennis shoes.  See id.  The

speeding ticket greatly upset Bryan and caused him to cry, mope, and remove his shirt to wipe

away his tears.  See id.  Bryan continued driving and eventually crossed the Coronado bridge.

See id.  However, Bryan had forgotten to refasten his seatbelt, and he was stopped by a Coronado

police officer for not wearing a seatbelt.  See id.  Officer MacPherson asked Bryan if he knew

why he had been stopped.  See id.  Bryan knew why he had been stopped, but as he was

becoming increasingly angry with himself, he said nothing and simply stared straight ahead.  See

id.  MacPherson directed Bryan to pull over to a curb and to turn down the radio.  See id.  Bryan

complied, but as he pulled the car over, he became increasingly angry with himself and began

hitting the steering wheel and yelling expletives at himself.  See id.  Bryan then stepped out of his

car.  See id.  Bryan was agitated, yelling gibberish, hitting his thighs, and wore only tennis shoes

and boxer shorts.  See id.  Bryan never threatened MacPherson and was standing between 20 and

25 feet apart.  See id.  There was a dispute whether Bryan took one step toward MacPherson.

See id.  Without warning, MacPherson shot Bryan with a taser.  See id.  The taser immobilized

Bryan, and Bryan fell face first on to a hard surface, causing him to fracture four teeth and suffer

facial contusions.  See id.

   The Ninth Circuit found that there was sufficient evidence for a jury to conclude that use

of the taser was excessive force.  See id. at *22.  The Ninth Circuit explained that Bryan was

unarmed, was simply standing by a car, was over 20 feet away from MacPherson, and never

attempted to flee.  See id.  "Bryan was neither a flight risk, a dangerous felon, nor an immediate

threat.  Therefore, there was simply no immediate need to subdue Bryan before [other] officers

arrived or less invasive means were attempted."  Id.

   Having found a constitutional violation, the Ninth Circuit next analyzed whether the law

was clearly established.  The Ninth Circuit found that the law was not clearly established and

granted MacPherson qualified immunity.  The Ninth Circuit explained:

   We do not need to find closely analogous case law to show that a right is clearly
   established.  However, as of July 24, 2005, there was no Supreme Court decision
   or decision of our court addressing whether the use of a taser, such as the Taser
   X26, in dart mode constituted an intermediate level of force.  Indeed, before that

date, the only statement we had made regarding tasers in a published opinion was that they were among the "variety of non-lethal 'pain compliance' weapons used by police forces." And, as the Eighth Circuit has noted, "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing." Two other [Ninth Circuit] panels have recently, in cases involving different circumstances, concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity.[19]

Based on these recent statements regarding the use of tasers, and the dearth of prior authority, we must conclude that a reasonable officer in Officer MacPherson's position could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances Officer MacPherson confronted in July 2005. Accordingly, Officer MacPherson is entitled to qualified immunity.

Id. at *23 (citations omitted).

The situation faced by MacPherson was more benign than the situation faced by Carr and Avila. MacPherson confronted a half naked teen who was standing stationary (albeit speaking gibberish and hitting his thighs) and who had simply not worn his seat belt. Carr and Avila were dealing with an individual who was reasonably suspected of motorcycle theft, trespass, and burglary and who was fleeing from the officers at full speed, immediately following a question about weapons. Part of the calculus that the Ninth Circuit noted in finding that MacPherson's conduct was unreasonable was that Bryan was not fleeing or a flight risk. See Bryan, 2010 WL 4925422 at *22. Excluding considerations of "deadly force," the active flight or evasion of a suspect generally favors an officer's use of force. See Miller, 340 F.3d at 965-66. Further, although Avila was following on foot, Carr was tiring and felt that he would be at a disadvantage if there was a physical confrontation. The taser is considered a less lethal force option, see Byan, 2010 WL 4925422 at * 15, and it had the desired effect of stopping the pursuit without requiring a physical confrontation with Azevedo. Finally, the law regarding tasers and excessive force is evolving. See id. at *23. As the Ninth Circuit recognized, prior to *Bryan*, the only statement that it had made regarding tasers was to describe them as a type of "non-lethal pain compliance weapon." Id. (quoting San Jose Charter of Hells Angels Motorcycle Club, 402 F.3d 962, 969 n.8 (9th Cir. 2005)). The analogous cases that the Court has found pre-November 7, 2007, indicate that a taser application is permissible to stop an actively fleeing individual.

---

[19] The two cited cases are: Mattos v. Agarano, 590 F.3d 108.2, 1089-90 (9th Cir. 2010); Brooks v. City of Seattle, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010).

Given the crimes at issue, the active flight and evasion of Azevedo following a question regarding weapons, Carr's fatigue, and the sparse yet developing state of the law on November 7, 2007, the Court concludes that the law regarding taser use was not clearly established such that a reasonable officer in Carr's position would know that use of the taser on Azevedo was improper. Cf. Bryan, 2010 WL 4925422 at *23; Beaver, 507 F.Supp.2d at 1144; Tillman, 2006 U.S. Dist. LEXIS 95591 at *14.  The Court will grant Carr qualified immunity for his use of the taser.

## II.    *Monell* Liability[20]

### Defendant's Argument

The City argues that its training touches on possible injuries from the taser, including those resulting from falls.  Further, Carr was aware of this training and considered that Azevedo was on a hard surface.  Further, the law, which guides the training that officers received, was not clearly established as it relates to tasers and excessive force.  Because the law was unclear, the City was not deliberately indifferent.  In November 2007, the taser was considered to be a less lethal force option than was appropriate to use against resisting and fleeing subjects.  The City trains its officers to use objectively reasonable force.  The City is not deliberately indifferent.

### Plaintiff's Opposition

Azevedo argues that the summary judgment on the *Monell* claims is inappropriate.  *Bryan* has no effect on the *Monell* claims because municipalities may not assert a qualified immunity defense.  In the previous summary judgment motion, the Court found that there is sufficient evidence of inadequate training.  The Court should not disturb its prior ruling.

### Discussion

The Court has previously found that there was sufficient evidence of inadequate training to survive summary judgment.  The Court relied on the opinions of Azevedo's expert witness and the number of persons in the City hierarchy who approved of Carr's taser usage.  See Court's

---

[20]Although the Court did not specify, when it requested briefing on the *Monell* claims in light of *Bryan*, it was concerned with the possibility that there might not be a Fourth Amendment violation.  If the taser use did not violate the Fourth Amendment, then Carr's taser use could not be the basis of a *Monell* claim.  See Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Simmons v. Navajo County, 609 F.3d 1011, 1021(9th Cir. 2010); Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001).

1    Docket Doc. No. 61 at p. 34.  The City's additional evidence indicates that the dangers of injuries

2    from falls are covered as part of the City's training.  However, there is insufficient evidence

3    regarding the actual training.  The Court only knows that the subject is touched upon.  The Court

4    does not know precisely what is said, how it is said, or the amount of time spent on the subject.

5    Further, the new evidence does not address Azevedo's expert's specific criticism or the number

6    of officers who approved Carr's use of the taser.  The new evidence is insufficient for the Court

7    to revisit its prior ruling and grant summary judgment.

8          Additionally, although *Bryan* recognizes the still developing jurisprudence concerning

9    tasers, *Bryan* does not provide a basis for summary judgment for the City.  By relying on the state

10   of the law to argue that it was not deliberately indifferent, the City comes too close to arguing a

11   form of qualified immunity.  The City's argument would lead to the defeat of nearly all *Monell*

12   claims where an officer receives qualified immunity due to non-clearly established law.  This

13   would create a *de facto* qualified immunity for municipalities.  A municipality is not entitled to

14   assert the defense of qualified immunity.  <u>Owen v. City of Independence</u>, 445 U.S. 622, 638

15   (1980); <u>Burke v. City of Alameda</u>, 586 F.3d 725, 734 (9th Cir. 2009); <u>Huskey v. City of San</u>

16   <u>Jose</u>, 204 F.3d 893, 902 (9th Cir. 2000).

17         Summary judgment on Plaintiff's inadequate training *Monell* claim is inappropriate.

18

19   **CONCLUSION**

20         As per the Court's order, Defendants have filed what the Court construes as a subsequent

21   summary judgment motion.  The issue of Carr's liability for use of a taser on Azevedo and the

22   issue of *Monell* claims were to be addressed in light of *Bryan v. MacPherson*.  Having reviewed

23   the additional briefing, the evidence viewed in the light most favorable to Azevedo supports

24   conflicting inferences regarding whether the Fourth Amendment was violated.  Accordingly, the

25   Court cannot grant summary judgment on the excessive force issue.

26         With respect to qualified immunity, *Bryan* makes clear that the jurisprudence surrounding

27   tasers is new and evolving.  The cases cited by Azevedo do not address the propriety of using a

28   taser against a suspect in flight.  Generally, the fact that a suspect is actively evading officers

supports a use of force by an officer.  Further, the only pre-November 2007 cases that the Court is aware of indicate that taser use on someone who is actively fleeing is constitutional.  The law regarding taser use was not so clearly established that a reasonable officer in Carr's position would have known that Carr's use of the taser was improper.  Therefore, the Court will grant Carr qualified immunity.

With respect to the *Monell* failure to train claim, the evidence presented is not sufficient for the Court to deviate from its prior ruling.  Additionally, the City's argument regarding *Bryan* is too close to a request for qualified immunity, which is not a valid defense for a municipality. Summary judgment on the *Monell* claim will be denied.

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant's motion for summary judgment on the issue of excessive force through Carr's use of the taser is DENIED;

2.  Defendant's motion for summary judgment on the issue of qualified immunity for Carr's use of the taser is GRANTED;

3.  Defendant's motion for summary judgment on Plaintiff's *Monell* claims is DENIED; and

4.  Within twenty-one (21) days of service of this order, the parties are to meet and confer regarding a new pre-trial conference date and trial date, and shall contact the Court's courtroom deputy with a list of agreeable dates so that the Court may set appropriate dates and deadlines for trial.

IT IS SO ORDERED.

Dated:    January 25, 2011

CHIEF UNITED STATES DISTRICT JUDGE